IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14CV537-RJC-DCK

| | |
|---|---|
| INDUSTRIAL PIPING, INC.,<br><br>      Plaintiff,<br><br>v.<br><br>TAO (MIKE) ZHANG, DAYI (SEAN) LIU, SCOTT PAUL, TIANWEI NEW ENERGY HOLDINGS CO., LTD. and DOES 1-10,<br><br>      Defendants. | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff Industrial Piping, Inc. (hereinafter referred to as "IPI"), pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, and for its First Amended Complaint and Demand for Jury Trial against Defendants, complains and alleges as follows.

## I.    INTRODUCTION

1.    Industrial Piping, Inc. claims negligent misrepresentation, fraud, and violations of Unfair or Deceptive Trade Practice Act against individual Defendants (Zhang, Liu, and Paul) as officers and directors of Hoku Materials, Inc., and against Defendant Tianwei based on the doctrine of respondeat superior. The claims, totaling in excess of $11 million, are based on the Defendants' express and continuing misrepresentations concerning the financial condition of Hoku Materials relating to its ability to pay IPI for work performed by IPI for the construction of a polysilicon manufacturing plant for Hoku Materials. These misrepresentations, not reasonably known to IPI, were made by Defendants in order to induce IPI to enter a contract with Hoku Materials and to induce IPI to continue working on the Project. It was not until after the Hoku Entities filed for bankruptcy that IPI obtained voluminous paper and electronic files from the trustee for the Hoku

Materials Estate. IPI has yet to receive or obtain the paper and/or electronic files from the trustee for the Hoku Corporation estate.

## II.     <u>PARTIES</u>

2.     Plaintiff IPI is a corporation formed under the laws of the state of Delaware with its principal place of business located in Pineville, Mecklenburg County, North Carolina. Defendants knew at all times that IPI's principal place of business is located in North Carolina.

3.     Hoku Corporation, Inc. was initially incorporated in Hawaii as Pacific Energy Group, Inc. in 2001 and then reincorporated in Delaware as Hoku Scientific, Inc. in 2004.

4.     In March 2010, Hoku Scientific, Inc. changed its name to Hoku Corporation.

5.     "Hoku Corporation" will be used herein to refer to Hoku Scientific or Hoku Corporation.

6.     Hoku Corporation's principal place of business was at all times located in Hawaii

7.     In January 2007, Hoku Corporation and the State of Idaho issued a joint press release announcing Hoku Corporation's plans to build a polysilicon manufacturing plant on 67 acres in Pocatello, Idaho under a 99 year ground lease from the city (""Project" or "Plant").

8.     In February 2007, Hoku Corporation incorporated Hoku Materials, Inc. ("Hoku Materials") under Delaware law as a wholly owned subsidiary for the manufacture of polysilicon to be used in the manufacture of solar panels.

9.     The Plant was owned by Hoku Materials.

10.     In March 2007, Hoku Corporation incorporated Hoku Solar, Inc., ("Hoku Solar") under Delaware law as a wholly owned subsidiary for the installation of arrays of solar panels.

11.     On December 22, 2009, Defendant Tianwei New Energy Holdings Co., Ltd. ("Tianwei"), a People's Republic of China Company, purchased controlling interest (60% of the

stock) in Hoku Corporation. Tianwei is part of a state-owned conglomerate known as the Baoding Tianwei Group, Ltd., ("Tianwei Group") owned and controlled by the Chinese government. The Tianwei Group claims to be a leading enterprise in the power transmission industry, and, as of 2008, it had 8,000 employees, assets in excess of $18 billion, and annual revenue in excess of $11 billion. Tianwei Group describes itself as "a member of the China South Industries Group." China South Industries Group owns more than 50 enterprises and describes itself "an important state-owned backbone enterprise directly under the central government."

12.     Defendant Tianwei, through its officers, directors, and employees owed IPI a duty to exercise reasonable care in obtaining and supplying accurate financial information to IPI for the guidance of IPI in its business transactions. Defendant Tianwei negligently and or recklessly provided false information to IPI concerning Hoku Materials' financial status over a period of several months to induce IPI to enter into a contract for the construction of the Project and to induce IPI to continue working on the Project when Hoku Materials and/or the Hoku Entities fell behind in making payment to IPI. Defendant Tianwei committed an unfair and deceptive trade practice against IPI, pursuant to North Carolina General Statutes, Section 75-1.1 *et seq* when it engaged in unfair or deceptive acts or practices in or affecting commerce against IPI.

13.     Defendant Tao (Mike) Zhang ("Zhang") has at all relevant times been and continues to be resident of the state of California. From 2009 to July 2, 2013 (the date the Hoku Entities filed for bankruptcy), Defendant Zhang served as Vice General Manager of Tianwei New Energy Holdings Co., Ltd. ("Tianwei"). Defendant Zhang served concurrently as a director of Hoku Corporation and the president of Hoku Materials as follows. He served as a member of the board of directors of Hoku Corporation from July 2010 to July 2, 2013 (the date all the Hoku Entities filed for bankruptcy). On October 20, 2010, the board of directors for Hoku Corporation

(not the Hoku Materials board) appointed Defendant Zhang as interim president of Hoku Materials. On August 19, 2011, the board for Hoku Materials (comprised of Defendant Paul and Darryl Nakamoto) signed a resolution ratifying the appointment of Defendant Zhang as interim president of Hoku Materials effective October 20, 2010.

14.     Acting concurrently as Vice General Manager of Defendant Tianwei and as president of Hoku Materials, Defendant Zhang, who had a pecuniary interest in the Project, owed IPI a duty to exercise reasonable care in obtaining and supplying accurate financial information to IPI for the guidance of IPI in its business transactions. Defendant Zhang negligently and or recklessly provided false information to IPI concerning Hoku Materials' financial status over a period of several months to induce IPI to enter into a contract for the construction of the Project and to induce IPI to continue working on the Project when Hoku Materials and/or the Hoku Entities fell behind in making payment to IPI. Defendant Zhang committed an unfair and deceptive trade practice against IPI, pursuant to North Carolina General Statutes, Section 75-1.1 *et seq* when he engaged in unfair or deceptive acts or practices in or affecting commerce against IPI.

15.     Defendant Dayi (Sean) Liu ("Liu") is a resident of the state of New Jersey. At all times relevant to this Complaint, Defendant Liu served as Accounting Manager for Tianwei. Defendant Liu served concurrently as Vice President of Finance of the Hoku Corporation from April 2011 to March 31, 2012, and was responsible for managing the finances of Hoku Corporation and Hoku Materials. On April 1, 2012, he was appointed by the board to serve as the principal financial officer for Hoku Corporation.

16.     As Vice President of Finance for Hoku Corporation, Defendant Liu was responsible for assuring that Hoku Materials had sufficient working capital to meet its obligations. Defendant Liu, who had a pecuniary interest in the Project, owed IPI a duty to exercise reasonable care in

obtaining and supplying accurate financial to IPI for the guidance of IPI in its business transactions. Defendant Liu negligently and or recklessly directed or approved providing false information to IPI concerning Hoku Materials' financial status over a period of several months to induce IPI to enter into a contract for the construction of the Project and to induce IPI to continue working on the Project when Hoku Materials and/or the Hoku Entities fell behind in making payment to IPI. Additionally, Defendant Liu committed an unfair and deceptive trade practice against IPI, pursuant to North Carolina General Statutes, Section 75-1.1 *et seq* when he engaged in unfair or deceptive acts or practices in or affecting commerce against IPI.

17.     Defendant Scott Paul ("Paul") has at all relevant times been and continues to be a resident of the state of Hawaii.  Defendant Paul is an attorney and served as Vice President, Business Development, and General Counsel for both Hoku Materials and Hoku Corporation from October 6, 2007 to March 31, 2010.  From April 1, 2010 to March 31, 2012, Defendant Paul served as one of seven directors for Hoku Corporation and one of two directors for Hoku Materials.  From April 1, 2010 to July 2, 2013 (the date the Hoku Entities filed for bankruptcy), Defendant Paul served as the CEO of both Hoku Materials and Hoku Corporation. Defendant Paul served as the President of both Hoku Materials and Hoku Corporation from April 1 to October 20, 2010, when Defendant Zhang replaced him as president of Hoku Materials.  Defendant Paul continued as President of Hoku Corporation until February 28, 2011, when (Jeremy) Xiaoming Yin was appointed president of Hoku Corporation to replace Defendant Paul.

18.     Defendant Paul, who had a pecuniary interest in the Project, owed IPI a duty to exercise reasonable care in obtaining and supplying accurate financial information to IPI for the guidance of IPI in its business transactions.  Defendant Paul negligently and or recklessly provided or directed the communication of false information to IPI concerning Hoku Materials' financial

status over a period of several months to induce IPI to enter into a contract for the construction of the Project and to induce IPI to continue working on the Project when Hoku Materials and/or the Hoku Entities fell behind in making payment to IPI. Additionally Defendant Paul committed an unfair and deceptive trade practice against IPI, pursuant to North Carolina General Statutes, Section 75-1.1 *et seq* when he engaged in unfair or deceptive acts or practices in or affecting commerce against IPI.

19. DOES 1-10 are entities or persons who participated in the conduct alleged herein but are as of yet unidentified. IPI will amend this Complaint to substitute the names of the unknown Defendants if and when those names are ascertained.

## III. JURISDICTION AND VENUE

20. This Court has personal jurisdiction over the Defendants under the due process clause of the United States Constitution and under one or more of the grounds set forth in North Carolina Code § 1-75.4, including without limitation the following: (a) IPI claims injury to its property within North Carolina arising out of the tortious and/or fraudulent acts or omissions committed within this State by each Defendant, (b) each Defendant's act or omission caused the injury to IPI claimed herein and each such Defendant, in the course of inducing IPI to enter into certain contracts and to continue to provide services under those contracts, provided false financial and other information to IPI at IPI's principal place of business in North Carolina, (c) this action arises out of a promises and/or inducements made to IPI to pay for services performed by IPI in North Carolina, (d) this action arises out of services actually performed for the Defendants by IPI in North Carolina and such performance was authorized or ratified by Defendants, and/or (e) this action relates to goods or other things of value shipped by IPI from North Carolina to the Defendants on their order or direction.

21.     Subject matter jurisdiction is proper in this court because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (b)(3).

23.     At all times relevant to this complaint, IPI was registered in Idaho as a contractor (number RCE-30442 issued by Bureau of Occupational Licenses), fire protection sprinkler contractor (license FPSC-072 issued by Department of Insurance), and class A-1 builder (license 14-00003126 issued by City of Pocatello), and is in good standing.

## IV.     STATEMENT OF FACTS

### a.  Hoku's History (2005-2009)

#### i.   Hoku's Primary Focus: The Polysilicon Plant

24.     Hoku Corporation was initially incorporated in 2001 and focused on developing and manufacturing components for fuel cells.

25.     In 2005, Hoku Corporation completed an initial public offering on the Nasdaq Global Market based on its prospects in the fuel cell industry.

26.     In 2006 and early 2007 Hoku Corporation shifted its focus away from fuel cells to the manufacture of polysilicon, which is used in the manufacture of solar panels, and to the installation of arrays of solar panels.

27.     In January 2007, Hoku Corporation and the State of Idaho issued a joint press release announcing Hoku Corporation's plans to build the Plaint.

28.     In early 2007 Hoku Corporation downsized its efforts to develop and manufacture components for fuel cells.

29. As stated above, in February 2007, Hoku Corporation incorporated Hoku Materials as a wholly owned subsidiary for the manufacturer of polysilicon to be used in the manufacture of solar panels and in March 2007, Hoku Corporation incorporated Hoku Solar as a wholly owned subsidiary for the installation of arrays of solar panels.

30. Hoku Corporation, Hoku Materials, and Hoku Solar, Inc. will be collectively referred to as the ("Hoku Entities.")

31. Hoku Corporation was a holding company that did not expect to generate significant revenue until Hoku Materials completed the polysilicon plant and began shipping polysilicon.

32. The Hoku Entities prepared consolidated financial statements combining the assets, revenues, and liabilities of the Hoku Entities.

33. The Hoku Entities filed one consolidated tax return each year.

34. The Hoku Entities operated as one economic unit.

35. The groundbreaking for the construction of the Plant occurred in March 2007, and at that time Hoku Corporation estimated that the total cost to bring the facility online to include approximately $260 million to construct the facility, plus working capital, and start-up costs.

36. Hoku Corporation projected that the construction would be complete the second half of 2008, with polysilicon shipments planned for the first half of 2009.

37. In August 2007, Hoku Materials entered into an agreement with JH Kelly LLC for construction services for the polysilicon plant.

38. During 2007 and 2008, to pay for the construction, Hoku Corporation and Hoku Materials obtained financing from lenders, issued stock, and also entered into a series of supply agreements with solar panel companies based in China.

39.     By the end of 2008, Hoku Corporation was no longer dedicating any resources to its fuel cell business and was not seeking additional opportunities.

40.     Construction and operation of the Plant was Hoku Materials' only activity and sole purpose.

41.     Though Hoku Corporation had a second operating subsidiary, Hoku Solar, its impact on the financial success of Hoku Corporation was close to negligible.

42.     In the consolidated financial statements, Hoku Corporation listed the Plant as its own asset.

43.     The Plant accounted for almost the full value of the assets shown by the consolidated financial statements.

44.     For example, as of March 31, 2010, Hoku Corporation's consolidated financials showed the construction of the plant accounted for $282 million of the total value of $287 million assigned to Hoku Corporation's combined "property, plant, and equipment," with almost all of the difference being the relatively small value (less than $6 million) assigned to Hoku Solar's assets.

45.     As of December 31, 2011 (two years and nine months later), Hoku Corporation reported the value the Plant had increased s $642 million, as a result of the work performed by IPI, JH Kelly, and other contractors on the Plant. The assets of Hoku Solar were a relatively small $8 million.

46.     From the date Defendant Tianwei gained control of Hoku to the Bankruptcy Date (July 2, 2013), Hoku Corporation generated no revenue of its own and Hoku Solar contributed millions of dollars of operating losses.

ii.     Supply Agreements with Chinese Polysilicon Customers

47. During 2007 and 2008, Hoku Materials entered into six supply agreements with six solar panel customers located in the Peoples Republic of China: Wuxi Suntech Co. Ltd.; Hanwha SolarOne, formerly Solarfun Power Hong Kong Ltd.; Jinko Solar Co., Ltd.; Wealthy Rise International, Ltd.; Shanghai Alex New Energy Co., Ltd.; Tianwei New Energy (Chengdu) Wafer Co., Ltd.

48. Under the terms of these supply agreements, the customers agreed to make prepayments to Hoku Materials in exchange for Hoku Corporation's agreement to supply specified quantities of polysilicon at predetermined pricing in future years.

   iii. <u>Tianwei Owned by Chinese Government</u>

49. Defendant Tianwei was and is the parent of one of the customers, Tianwei New Energy (Chengdu) Wafer Co., Ltd. ("Tianwei Wafer.")

50. Defendant Tianwei is part of a state-owned conglomerate known as the Baoding Tianwei Group, Ltd., ("Tianwei Group") owned and controlled by the Chinese government. The Tianwei Group claims to be a leading enterprise in the power transmission industry, and, as of 2008, it had 8,000 employees, assets in excess of $18 billion, and annual revenue in excess of $11 billion. Tianwei Group describes itself as "a member of the China South Industries Group." China South Industries Group owns more than 50 enterprises and describes itself "an important state-owned backbone enterprise directly under the central government."

   iv. <u>Foreign Trade Zone Status</u>

51. In October 2008, Boundary County, Idaho, which was is located on the Canadian border and which at that time was designated as foreign trade zone, applied to the Foreign Trade Zones Board to have the Hoku site at Pocatello (hundreds of miles south of Boundary County)

designated a "special-purpose subzone status with manufacturing authority at the polysilicon facility of Hoku Materials, Inc."

52.     On August 17, 2009, the Foreign Trade Zones Board granted the subzone status. The subzone designation allowed Hoku to:

    a.  Avoid meeting customs requirements, as the subzone was considered to be outside the customs area of the U.S.;

    b.  Import raw materials to be used in the manufacture of polysilicon and not pay import duties;

    c.  Avoid paying duties on polysilicon sold/exported back to China; and

    d.  Avoid paying state and local ad valorem taxes on inventory.

53.     Idaho and Pocatello also provided tax incentives, financial support for infrastructure improvements around the polysilicon plant, and grants to fund the training of new employees.

54.     In April 2010, the U.S. federal government granted Hoku Corporation/Hoku Solar a Section 1603 grant in the amount $2,299,097 based on Hoku Corporation's status as a solar energy project developer.

            v.      Hoku's 2009 Liquidity Crisis

55.     Hoku Corporation's consolidated financial statements show that during fiscal years prior to 2009 it maintained positive working capital in excess of $20 million.

56.     The Hoku Entities operated on a fiscal year that ended on March 31.

57.     As of the end of the 2009 fiscal year on March 31, 2009, Hoku Corporation's consolidated financial statement showed it had a working capital deficiency of $20 million, raising concerns about the ability of the Hoku Entities to continue as a going concern.

58.    As of June 30, 2009, the working capital deficiency had increased to $37 million.

59.    In a press release dated July 30, 2009, Dustin Shindo, the president and CEO of Hoku Corporation, announced that Hoku had taken "steps to temporarily slow construction and procurement efforts" for the polysilicon plant to preserve cash while Hoku sought additional working capital, which could take several months.

60.    Hoku Corporation did not expect to generate significant revenue until it completed the polysilicon plant and began shipping polysilicon.

vi.    Defendant Tianwei's Purchase and Control of Hoku

61.    On or about September 28, 2009, Hoku Corporation entered into a stock purchase agreement with Defendant Tianwei ("Stock Purchase Agreement") to recapitalize Hoku Corporation and put the "liquidity crises" behind them.

62.    As of September 28, 2009, Tianwei Wafer had entered into two supply agreements with Hoku Materials, pursuant to which Tianwei Wafer had made $79 million in prepayments to Hoku Materials.

63.    Under the Stock Purchase Agreement, in exchange for the issuance of 60% (33,379,287 shares) of Hoku Corporation's common stock and a warrant to purchase 10,000,000 shares of Common Stock at the price of $2.52/share, Defendant Tianwei agreed to:

a.    Cause its subsidiary, Tianwei Wafer, to cancel $50 million of the $79 million in prepayments already made by Tianwei Wafer, to Hoku Corporation's subsidiary, Hoku Materials; and

b.    Provide collateral support for a two year term loan in the amount of a $50 million from China Construction Bank to Hoku Corporation.    To provide collateral for the loan, Tianwei deposited cash collateral in an account China

Construction Bank in China. The bank then issued a letter of credit to its New York Branch which in turn disbursed the proceeds from its U.S. based account directly into the U.S. based account of Hoku Corporation in Hawaii. This process did not involve the transfer of any dollars or yuan (a/k/a Renminbi or RMB) from China to the U.S. Given the size of Tianwei, and the fact that Tianwei was backed by the Chinese government, the bank had virtually no risk in making this loan. Also, in light of the cash and/or letter of credit posted by Tianwei, it was almost certain that Tianwei would take a loss on a default by Hoku.

64.     On December 22, 2009, Defendant Tianwei closed on the purchase of the stock and the $50 million in loan proceeds were distributed to Hoku Corporation over the next two months.

65.     To assure that contractors would be paid past due amounts, the $50 million Entrustment Loan Contract expressly required Hoku Corporation (not Hoku Materials) to "utilize the Loan for the purpose of satisfying vendor payables outstanding as of the date hereof, payables relating to pilot testing and achieving at least 40 metric tons of solar-grade polysilicon that meet customer specifications at the polysilicon plant currently being constructed by Hoku Materials, Inc."

66.     Hoku Materials executed a "Subsidiary Guarantee," pursuant to which Hoku Materials guaranteed the obligations of Hoku Corporation and agreed to secure the Subsidiary Guarantee by providing liens on all its assets, including the Project. This led to the recording of a Deed of Trust, Security Agreement, and Fixture Filing in Bannock County on January 29, 2010 upon closing of the loan, with Hoku Materials as the grantor and Tianwei as the beneficiary.

67.     As a result of the stock purchase, Defendant Tianwei had complete control over Hoku Corporation and Hoku Materials from the date of the closing (December 22, 2009) to the date until the Hoku entities filed bankruptcy on July 2, 2013 ("Bankruptcy Date").

vii.    Directors of Hoku Corporation

68.     Subsequent to the closing, Defendant Tianwei took the following actions:

a.  Increased the size of the board of directors of Hoku Corporation from five to seven;

b.  Appointed Yu Wen, Zhong Li, Wei Xia, and Yi Zheng, all of whom lived in China and were employed as managers for Tianwei or its affiliates, to the board of directors of Hoku Corporation;

c.  In July 2010, appointed Defendant Zhang, a Vice General Manager for Tianwei who resided in the U.S., as Director of Hoku Corporation;

d.  Appointed Wei Xia, a Vice-General Manager for Defendant Tianwei and newly appointed board member, as Chairman of the Board effective April 1, 2010.  Mr. Xia served as Chairman as he continued to live in China through the Bankruptcy Date;

e.  Appointed Defendant Paul as Hoku Corporation's Chief Executive Officer, effective April 1, 2010, to succeed Dustin Shindo, who had served as CEO since 2001.  Defendant Paul served as CEO of Hoku Corporation until June 30, 2012;

f.  In October 2010, additionally appointed Defendant Zhang, as President of Hoku Materials.  Defendant Zhang served as President of Hoku Materials until the Bankruptcy Date; and

g.  Appointed Defendant Liu, an accounting manager for Defendant Tianwei, to serve as Vice President of Finance for Hoku Corporation and in that capacity was responsible for managing Hoku Corporation's finances.

viii.  Directors of Hoku Materials

69.  Hoku Materials had two directors who also served as directors for Hoku Corporation.

70.  Darryl Nakamoto served as a director for both Hoku Materials from the date its incorporation in February 2007 to March 31, 2012.  During that time, Mr. Nakamoto also served as a director for Hoku Corporation.

71.  Dustin Shindo served as the second director for Hoku Materials from the date of its incorporation in February 2007 to March 31, 2010.  During that time, Mr. Shindo also served as a director for Hoku Corporation.

72.  Beginning on April 1, 2010 and continuing to March 31, 2012, Defendant Paul replaced Dustin Shindo as the second director for Hoku Materials.  During that time, Defendant Paul also served as a director for Hoku Corporation.

ix.  Officers of Hoku Corporation and Hoku Materials

73.  President.  Dustin Shindo served as president for both Hoku Corporation and Hoku Materials from the date of Hoku Materials' incorporation in February 2007 to March 31, 2010. From April 1, 2010 to the October 20, 2010, Defendant Paul served as the President of both Hoku Materials and Hoku Corporation.  On October 20, 2010, Defendant Tianwei appointed Defendant Zhang as a member of the board of directors of Hoku Corporation and that board (not the Hoku Materials board) appointed Defendant Zhang as Interim President of Hoku Materials. Defendant

Paul continued as President of Hoku Corporation until, February 28, 2011, when (Jeremy) Xiaoming Yin was appointed president of Hoku Corporation to replace Defendant Paul.

74. CEO. Dustin Shindo served as president and CEO for both Hoku Corporation and Hoku Materials from the date of Hoku Materials' incorporation in February 2007 to March 31, 2010. After April 1, 2010 to July 2, 2013, when Hoku Corporation and Hoku Materials filed for bankruptcy, Defendant Paul served as the CEO of both Hoku Materials and Hoku Corporation.

75. Vice President, Business Development and General Counsel. Defendant Paul is an attorney and he served as Vice President, Business Development and General Counsel for both Hoku Materials and Hoku Corporation from October 6, 2007 to March 31, 2010, at which time he was appointed President and CEO of both Hoku Materials and Hoku Corporation.

76. Chief Financial Officer and Secretary. Darryl Nakamoto served as Chief Financial Officer and Secretary for both Hoku Materials and Hoku Corporation from the date of Hoku Materials' incorporation in February 2007 to March 31, 2012. On April 1, 2012, Defendant Liu was appointed to replace Nakamoto as the company's principal financial officer.

77. Chief Technology Officer. Karl Taft served as Chief Technology Officer for both Hoku Materials and Hoku Corporation from October 6, 2007 to March 31, 2012. Mr. Taft also served as a director for Hoku Corporation from the date of its incorporation in 2011 until the date Defendant Tianwei purchased a controlling interest in Hoku Corporation December 22, 2009.

78. Vice President of Finance. Defendant Liu served as Vice President of Finance of the Hoku Corporation beginning April 2011, and was responsible for managing the subsidiary's finances. He served concurrently as accounting manager for Defendant Tianwei and/or worked under Defendant Tianwei's direction. On April 1, 2012, he was appointed Vice President of Finance by the board of Hoku Corporation to serve as the company's principal financial officer.

79.     As shown above, all the officers of Hoku Materials also served at all relevant times as an officer of Hoku Corporation with an identical title or, in the case of Defendant Zhang, simultaneously served as President of Hoku Materials and as a director for Hoku Corporation.

x.     Hoku's Executive Committee

80.     On October 20, 2010, the board of directors of Hoku Corporation (not Hoku Materials) appointed Defendant Zhang to serve as Interim President of Hoku Materials "with overall responsibility for the construction and operation of the polysilicon manufacturing business of Hoku Corporation."

81.     On May 18, 2011, the board of directors of Hoku Corporation appointed a "Hoku Materials Executive Committee" to oversee the operations of Hoku Materials.

82.     The Hoku Materials Executive Committee included the Chairman of the Board of Hoku Corporation (namely Defendant Tianwei's Vice General Manager, Wei Xia, a resident of China), the Chief Executive Officer and President of Hoku Corporation (Defendant Paul), and the President of Hoku Materials (Defendant Zhang).

83.     By Resolution dated August 19, 2011, the board of directors of Hoku Materials ("August 19, 2011 Resolution"), comprised of Defendant Paul and Darryl Nakamoto, approved a Resolution that ratified and approved the appointment of Defendant Zhang as president by the Hoku Corporation board of directors as of October 20, 2010 and ratified and approved all actions taken by Defendant Zhang after the appointment.

84.     The August 19, 2011 Resolution also ratified and approved the formation of the Hoku Materials Executive Committee.

85.     The August 19, 2011 Resolution also required that Defendant Zhang "shall report to and take directions from the Hoku Materials Executive Committee [including Wei Xia and

Defendant Paul] and that he is authorized and directed on behalf of the Company to due [sic – do] and perform such acts and things he is directed to do by the Hoku Materials Executive Committee."

86.     The foregoing provision made clear that Defendant Paul and Wei Xia personally directed and ratified all actions Defendant Zhang undertook in his role with the Hoku Materials.

### b.     Contracts between IPI and Hoku Materials

#### i.     Vessel Fabrication Contract ($506 thousand)

87.     The initial contact between IPI and Hoku Materials concerning the Plant occurred on about May 5, 2010, when Mr. Joe Smith, a manager for Hoku Materials in Idaho called Mike Roberts, a Senior Vice President for IPI in Pineville, North Carolina, to solicit IPI to perform work on the Plant.

88.     Hoku Materials subsequently entered into six contracts with IPI.

89.     By contract dated on or about September 9, 2010, Hoku Materials entered into a contract with IPI in North Carolina to fabricate and supply a vessel for the Plant ("Vessel Fabrication Contract").

90.     The Vessel Fabrication Contract was reviewed and executed by Defendant Paul on September 10, 2010.

91.     The Vessel Fabrication Contract was also signed by Mr. Qin Lijun, a resident of China and an officer or manager for Defendant Tianwei.   Mr. Lijun signed the Vessel Fabrication Contact even though he was not an officer or director of Hoku Corporation or Hoku Materials.

92.     IPI began working on the Vessel Fabrication Contract in September 2010, performing design and engineering work in its offices in North Carolina.  IPI later fabricated the vessel in its shop and shipped it to Idaho.

93.     The Vessel Fabrication Contract was in the amount of approximately five hundred six thousand dollars ($506,000).

94.     Beginning in or around April 2011, IPI's scope of work expanded greatly with the issuance of several new contracts, each forwarded to IPI in North Carolina and executed by IPI in North Carolina.

95.     From April 2011 through May 2012, IPI performed in excess of $30 million of work for the Plant

ii.     Tank Farm Contract ($13 million)

96.     Acting at the direction and with the full knowledge and approval of Defendant Paul and Defendant Liu, Defendant Zhang and his project managers for Hoku Materials contacted IPI in North Carolina in first quarter of 2011 to ask IPI to perform additional work on the Project.

97.     On or about January 25, 2011, Steven Phillips, the Director of Project Management for Hoku Materials, acting at the request and at the direction of Defendant Zhang, emailed Mike Jones, President of IPI to ask what additional services IPI could provide for the Project. This request led to meetings between Zhang and Phillips on behalf of Hoku Materials and the IPI management team in which Zhang and Phillips discussed what additional services IPI could perform.

98.     Phillips' email and the subsequent meetings and meetings led to IPI submitting a proposal to perform a scope of work referred to as the "Tank Farm."

99.     By contract dated April 7, 2011 ("Tank Farm Contract"), Hoku Materials hired IPI to fabricate and install process piping in the tank farm area of the Project in exchange for payment in excess of $13 million, including change orders.

100.    The Tank Farm Contract was sent to Defendant Paul who personally reviewed and approved the terms of the contract.

101.    After receiving the approval of Defendant Paul and at Defendant Paul's direction, Defendant Zhang executed the Tank Farm Contact as President of Hoku Materials.

### iii.    Steel Supply Agreement ($9 million)

102.    Acting at the direction and with the full knowledge and approval of Defendant Paul and Defendant Liu, Defendant Zhang and his project managers for Hoku Materials contacted IPI in North Carolina to ask IPI to supply structural steel for a portion of the project.

103.    This request led to IPI submitting a proposal to supply structural steel.

104.    By a contract dated on or about July 1, 2011, Hoku Materials contracted with IPI to supply structural steel for the Plant in exchange for payment in excess of nine million dollars ($9,000,000.00) ("Steel Supply Agreement").

105.    The Steel Supply Agreement was sent to Defendant Paul who personally reviewed and approved the terms of the agreement.

106.    After receiving the approval of Defendant Paul and at Paul's direction, Defendant Zhang  executed the Steel Supply Agreement as president of Hoku Materials.

### iv.    Design Support for Fire Protection System ($224 thousand)

107.    By contract dated on or about August 19, 2011, Hoku Materials hired IPI to provide design support for a fire protection system for the Plant.  Defendant Zhang executed the contract as President of Hoku Materials.

### v.    Design Support Contract ($43 thousand)

108. By contract dated on or about September 16, 2011, Hoku hired IPI to provide design support for the Plant in the amount of $43 thousand. Defendant Zhang executed the contract as President of Hoku Materials.

vi.     Master Construction Services Agreement (MCSA)

109. Acting at the direction and with the full knowledge and approval of Defendant Paul and Defendant Liu, in or around the summer of 2011 Defendant Zhang and his project managers for Hoku Materials contacted IPI in North Carolina to ask IPI to perform various scopes of work as requested and as needed by Hoku Materials under task orders issued under a master construction agreement. This request led to IPI submitting a proposal.

110. By a contract entitled "Master Construction Services Agreement" ("MCSA") dated on or about September 28, 2011, Hoku Materials, as "Owner," hired IPI to provide miscellaneous construction services pursuant to a series of "task orders" issued by Hoku pursuant to the MCSA. Hoku issued nine task orders (numbered 1-7, 10, and 11) for work valued in excess of $9 million ("Task Orders").

111. The following allegations and claims will focus only on the three large contracts: the MCSA, the Tank Farm Contract, and the Steel Supply Agreement.

vii.     Express and Continuing Representations in Section 3.9 of MCSA

112. Hans Ransom ("Ransom"), Senior Vice President for IPI, working from IPI's home office in North Carolina, received the initial proposed contract form for the MCSA in North Carolina delivered to him by the Defendant Zhang and the Hoku project management team at the direction and/or approval of Defendant Paul and Defendant Liu.

113. Prior to the execution of the MCSA, several drafts and markups of the agreement were circulated between the Hoku Entities and IPI during September 2011.

114.    In order to induce IPI to enter into the MCSA contract, all the drafts as well as the final version of the agreement included Section 3.9 in which Defendants and Hoku Materials made a number of express and continuing representations, including the following:

### 3.9    Representations and Warranties of Owner

Owner [Hoku Materials] makes the following <u>express</u> representations and warranties to Contractor, which shall be <u>continuing</u> during the term of this Agreement:

....

3.9.4   <u>Owner</u> has thoroughly and carefully examined and fully understands the terms of this Agreement and is fully able to perform all of Owner's duties and obligations hereunder;

....

3.9.7   <u>Owner</u> is financially solvent, able to pay its debts as they mature and has sufficient working capital to complete its obligations under this Agreement.

[underlining added]

115.    One of the Owner's "obligations" as referenced above was set forth in Section 6.2.6 of the MCSA, obligating Hoku Materials to pay IPI within thirty (30) days of receipt of an invoice.

116.    Believing and justifiably relying on the foregoing representations by Defendants, i.e., that Hoku Materials was "fully able to perform" all of its duties and obligations, was "financially solvent," had "sufficient working capital to complete its obligations" under the

MCSA, and had the resources to pay IPI within 30 day of receipt of an Invoice, Mr. Ransom. Senior Vice President for IPI working at the home office in Pineville, North Carolina, executed the MCSA on September 28, 2011.

117.    In authorizing and delivering the proposed MCSA to IPI in September 2011 at IPI's main office in North Carolina, Defendant Zhang, Defendant Paul and Defendant Liu intended that IPI's management team located in North Carolina would rely on the express and continuing representation and thereby induce IPI to execute the MCSA and to begin work on the MSCA.

118.    At the direction and approval of Defendant Paul and Defendant Liu, Defendant Zhang executed the MCSA and the task orders on October 6, 2011 as president of Hoku Materials.

119.    By executing and/or directing the execution of the MCSA, the Defendants adopted, verified, and attested to the truth of the express and continuing representations set forth in Section 3.9 of the MCSA.

120.    After executing the MCSA, and at the direction and approval of Defendants Paul and Liu, Defendant Zhang delivered or directed his management team to deliver an executed copy of the MCSA to IPI in North Carolina.

121.    As shown above, Defendants represented in Section 3.9.4 above that "Owner has thoroughly and carefully examined and fully understands the terms of this Agreement…."

122.    In the preamble on the first page, the MCSA defined "Owner" as "Hoku Materials, Inc."

123.    Hoku Materials could only act to "thoroughly and carefully" examine the MCSA through its officers and employees.

**c.    Defendant Paul's Participation**

124. As stated above, Defendant Paul reviewed and approved the terms of the MCSA and authorized Defendant Zhang to execute the MCSA.

125. By reviewing and approving the MCSA, Defendant Paul verified the truth of the express and continuing representations set forth in Section 3.9 of the MCSA.

126. As an attorney, Defendant Paul served as General Counsel for Hoku Materials and Hoku Corporation for years prior to his appointment as President and CEO on April 1, 2010.

127. At the time of negotiation and execution of the MCSA in or about September 2011, Defendant Paul held the following positions:

    a.   President and CEO of Hoku Corporation and Hoku Materials;

    b.   Director for both Hoku Corporation and Hoku Materials; and

    c.   Member of the special "Hoku Materials Executive Committee," along with the Chairman of the Board (Wei Xia) and the president of Hoku Materials (Defendant Zhang).

128. Moreover, Defendant Zhang represented in Section 3.9.2 of the MCSA that "the execution, delivery, and performance by Owner of this Agreement have been duly authorized by all requisite corporate action of the Owner…."

129. Thus, prior to "execution" and "delivery" of the MCSA to IPI, Defendant Zhang had to comply with all requisite corporate actions.

130. A significant "requisite corporate action" imposed on Defendant Zhang was set forth in the August 19, 2011 Resolution adopted by the Hoku Board of Directors, which, as noted above, required Zhang to report to and take direction from Defendant Paul and Wei Xia.

131.    In practice, Defendant Zhang did not execute any contracts without first providing the contract to Defendant Paul as a member of the Executive Committee for his review and approval of the terms of the contract.

132.    Generally, Defendant Zhang did not take action to execute on contracts or change orders to contracts without first getting the approval of Wei Xia as a member of the Executive Committee.

133.    After receiving the approval of Defendant Paul and Wei Xia and at Defendant Paul's direction, Defendant Zhang executed the MCSA on behalf of Hoku on or about October 6, 2011.

**d.    Defendant Liu's Participation**

134.    As Vice President of Finance for Hoku Corporation, Defendant Liu was responsible for preparing budgets, making cash flow projections, and assuring that Hoku Materials had sufficient working capital to meet its obligations.

135.    Defendant Liu worked closely with Defendants Paul and Zhang and provided them with information and discussed with them on a regular basis the budgets, cash flow projections, and working capital needs of Hoku Materials.

136.    Defendant Liu approved and encouraged Defendants Paul and Zhang to explain to contractors, including IPI, that Hoku Materials had sufficient working capital and to the ability to meet its obligations as they came due under the MCSA and other contracts.

137.    Defendant Liu intended that contractors, including IPI, rely on the information he provided to Defendants Paul and Zhang.

138.    Defendants Paul and Zhang relied on the information provided by Defendant Liu as reflected in the Representations in Section 3.9 the MCSA.

139. The discussions and exchange of information between Defendants Paul, Zhang, and Liu continued on an ongoing basis and the false information and misrepresentations made by Defendants Paul and Zhang as averred throughout this Complaint were all made based in large part on information provided by Liu and with Liu's encouragement.

### e. <u>Wei Xia's Participation</u>

140. As Vice General Manager of Defendant Tianwei, a member of the Executive Committee and Chair of the Board of Directors for Hoku Corporation, Wei Xia exercised a great deal of control over Defendants Zhang, Liu, and Paul.

141. As an example of the extent of his control, Mr. Xia, though he was not an officer or director of Hoku Materials, required that he sign and approve change orders to construction contracts between Hoku Materials and its contractors.

142. Mr. Xia also controlled the degree to which Defendant Tianwei provided resources to Hoku Corporation and Hoku Materials, thereby determining directly whether Hoku Materials had sufficient working capital to meet its obligations under the MCSA and on the Project in general.

143. Mr. Xia communicated regularly with Defendants Liu, Paul, and Zhang and encouraged them to proceed with the Project and to falsely represent to contractors, including IPI, that Hoku Materials had sufficient financial resources (including working capital) to pay its debts as they matured.

144. Mr. Xia provided this direction to Defendants Liu, Paul, and Zhang even though Defendant Tianwei continually refused (at Xia's direction) to provide Hoku Materials with the needed financial resources in to be able to meet its obligations.

145.    The discussions and exchange of information between Defendants Paul, Zhang, and Liu continued on an ongoing basis and the false information and misrepresentations made by Defendants Paul, Liu, and Zhang as averred throughout this Complaint were all made at the direction and with the knowing approval of Mr. Xia.

146.    Though Xia is not included as a defendant because he resides in China, his role as a Vice General Manager for Defendant Tianwei is significant in establishing the liability of Defendant Tianwei under the doctrine of Respondeat Superior.

**f.    No Dollars or Yuan were ever Transferred from China to the U.S.**

147.    As explained earlier, Hoku Corporation (the parent holding company), Hoku Materials, and Hoku Solar operated as one economic unit with consolidated financials, so the points made below are based on the consolidated financial statements.

148.    During the entire time that Defendant Tianwei controlled Hoku Corporation from the stock purchase on December 22, 2009 to the Bankruptcy Date (July 2, 2013), Defendant Tianwei never allowed Hoku Corporation or any of the Hoku Entities to achieve positive working capital, despite the initial $50 million entrustment loan and despite subsequently arranging twenty-two (22) loans from banks located in the U.S. through May 2012.

149.    For each and every one of these loans, Defendant Tianwei deposited cash with the Chinese bank in China to serve as collateral for the loan.  The Chinese bank would then provide a letter of credit to its branch in the U.S. and that branch would then disburse the loans to the Hoku Entities.  With this approach, no dollars or yuan were transferred from China to the U.S. Additionally, the U.S. based bank had no risk, given that the loan was secured by a letter of credit from the China based bank, which in turn was secured by cash deposited by in China by Defendant

Tianwei. Moreover, Defendant Tianwei was a very large state-owned company with billions of dollars in assets and revenues.

150. The U.S. based Chinese banks would disburse proceeds to the Hoku Entities from their U.S. based accounts directly into one or more bank accounts maintained by the Hoku Entities in Hawaii.

151. At no time did Defendant Tianwei, any bank, or any other entity transfer dollars or yuan from China to the U.S. to provide funding to the Hoku Entities.

152. The Hoku Entities never had an account in China from which it could transfer funds to the U.S.

153. IPI reasonably was unaware of the loans to Hoku Corporation and/or Hoku Materials and how the financing worked. Section 3.9 of the MCSA and all the misrepresentations alleged herein up to January 2012, reasonably led IPI to believe that Hoku Materials had sufficient financial resources and/or working capital to meet its financial obligations, i.e. that it had its own financial resources and was not dependent on financing from Tianwei or any other entity.

154. It was not until after the Hoku Entities filed for bankruptcy and the Hoku Entities internal documents were made available to IPI and others by the trustee for Hoku Materials that the true financial condition of the Hoku Materials became known to IPI.

**g.** **Hoku's Financial Condition as of September 2011**

155. By September 2011, the financial condition of Hoku Corporation and Hoku Materials had degenerated to a point where it did not have the financial resources to meet its obligations as they matured and it had a huge working capital deficiency equal to $231 million.

156. On April 14, 2011, the Hoku management team presented a comprehensive operating and budget plan document ("Plan") to the Hoku Corporation board of directors.

157. The Plan was marked "STRICTLY CONFIDENTIAL."

158. The Plan stated Hoku Corporation's objective was to start production of polysilicon in October 2011, with the further objective of first generating revenue from the sale of polysilicon in the first quarter of 2012.

159. The Plan explained that many vendors, including the contractors working on the Project, had requested "assurances that they will be paid going forward," and that "We are managing these relationships, but it is becoming increasingly difficult due to our inability to pay on a timely basis."

160. To reach the objective of producing polysilicon by October 2011, the Plan stated that Hoku Corporation would need additional financing totaling $214 million.

161. The Plan also explained that Hoku Corporation anticipated borrowing "tranches" in the amount of $10 million to $25 million each month, plus a $100 million loan in September 2011.

162. Hoku Corporation and Hoku Materials fell far short of these goals.

163. As of September 28, 2011 (when IPI executed the MCSA) and October 6, 2011 (when Defendant Zhang executed the MCSA), Hoku Materials had incurred substantial overrun in projected costs, but was not close to being ready to begin production of polysilicon.

164. Moreover, Hoku Corporation failed to raise financing needed to pay for the projected costs, much less the cost overrun. In fact, from April 1 to October 30, 2011, Hoku Corporation secured only $100 million in financing (part of the 22 total loans as explained above), as follows:

**Table 1: Loans Arranged by Tianwei (May through October 2011)**

| Date | Amount | Lender | Location |
|------|--------|--------|----------|

| 04/06/2011 | $15 million | China Merchants Bank Co. Ltd | New York City |
|---|---|---|---|
| 06/02/2011 | $24.7 million | Commercial Bank of China Limited | New York City |
| 08/062011 | $15 million | Bank of China | New York City |
| 09/01/2011 | $10 million | Industrial and Commercial Bank of China Limited | New York City |
| 10/05/2011 | $13.6 million | Industrial and Commercial Bank of China Limited | New York City |
| 10/12/2011 | $22.1 million | Bank of China | New York City |
| **Total:** | **$100.4 million** | | |

165.    Every one of these loans required Hoku Corporation to use the proceeds solely for the purpose of paying for the construction of the Plant.  Thus, though the funds were distributed to Hoku Corporation as Borrower, it served merely as a conduit for the earmarked funds since the intended beneficiary was Hoku Materials as the owner of the Plant.

166.    As a result of budget overruns, a failure to meet the schedule for starting production, and the failure to raise needed financing, Hoku Corporation's consolidated financial statement showed that its working capital deficiency had exploded to $231 million as of September 2011.

167.    The negative $231 million in working capital was shown by a quarterly report filed by Hoku Corporation with the Securities and Exchange Commission on November 25, 2011.

168.    Accounts payable (owed mostly to contractors) had ballooned to tens of millions of dollars, and the Hoku Entities had only $10 million in total current assets that it could use to pay these and other current liabilities totaling $241 million.

169.    Hoku Corporation and Hoku Materials did not have any realistic plan or chance of getting out this deep hole.

170.    The Hoku Entities had no substantial revenues, and Hoku Materials was, at best, still months away from producing any polysilicon from the plant.  In fact, the plant never achieved production.

171.    Hoku Corporation and Hoku Materials had no ability to borrow any funds, and were entirely dependent on Tianwei providing cash collateral support to induce additional loans from banks.

172.    In fact, Hoku Corporation's "Executive Team" met by telephone on a weekly or bi-weekly basis to try to address these issues.

173.    The Executive Team meetings included Defendant Paul, Defendant Zhang, Jeremy Yin, and/or Darryl Nakamoto.  Each of these individuals received minutes of every meeting.

174.    The Executive Team met by telephone conference hosted from Hawaii.

175.    Each and every set of minutes of the Executive Team meetings (marked "Confidential & Proprietary") show that from May 23, 2011 to Jan 4, 2012, Hoku Corporation continually requested that Defendant Tianwei provide Hoku Corporation and Hoku Materials with the resources needed to meet Hoku's Materials financial obligations.

176.    The minutes of the May 23, 2011 Executive Team meeting stated, for example: "Going concern model shows approximately $200 million in funds needed.  There is some upside but very little."

177.    The minutes of the June 7, 2011 Executive Team meeting stated: "$300 million should eliminate going concern issue."

178.    Defendant Tianwei continually refused, however, to provide the financial resources Hoku Materials needed to meet its obligations, and further refused to commit to doing so, leaving

Hoku Materials instead with a huge working capital deficiency of $231 million as of the quarter ending September 30, 2011.

179. Defendant Liu worked with that Executive Team in preparing budgets, making cash flow projections, and attempting to assure that Hoku Materials had sufficient working capital to meet its obligations.

180. Defendant Zhang, Defendant Paul, Defendant Liu, and Wei Xia knew or, with the exercise of reasonable care, should have known about Hoku Materials' financial condition as of September 28, 2011 (the date the MCSA was executed by IPI) and/or October 6, 2011 (the date the MCSA was executed by Defendant Zhang).

181. Defendant Zhang, Defendant Paul, Defendant Liu, and Mr. Xia knew or, with the exercise of reasonable care, should have known that the Hoku Entities had a huge working capital deficiency of $231 million as of September 2011 and that Hoku Materials could not meet its obligations under existing contractual obligations, much less for new contracts added on top of the existing obligations.

182. Defendant Zhang, Defendant Paul, Defendant Liu, and Mr. Xia, based upon their respective positions with the Hoku Corporation, Hoku Materials, and Defendant Tianwei, each had a pecuniary interest in inducing IPI to continue to perform services on behalf of the Hoku Entities in that their compensation and continued employment depended on the success of the Project. As such, Defendants Zhang, Paul, and Liu had a duty to IPI to exercise reasonable care to not provide false financial or other information about Hoku Materials for the guidance of IPI in their business transactions, to induce IPI to execute or to continue to deliver services under IPI's contracts with Hoku Materials.

183.     IPI reasonably had no knowledge of the true status of Hoku Materials' financial condition and reasonably relied on the false representations made by Defendants in providing and continuing to provide services under its contracts.

### h.     Falsity of the Representations in Section 3.9 of the MCSA

184.     The express representations set forth in Section 3.9 in the MCSA were clearly false when made in the first draft of the MCSA forwarded to IPI in the late summer of 2011 and subsequently executed by IPI on September 28, 2011 and Zhang on October 6, 2011 based on the financial condition of Hoku Corporation at the time.

185.     The representation made by Defendants Zhang, Paul, and Liu that Hoku Materials (the "Owner") was fully able to perform all of its obligations hereunder was false at the time the representations were made in light of its complete lack of resources as evidenced by negative working capital, the failure of Hoku to obtain the required level of financing, the budget overrun, the failure to meet schedule, Defendant Tianwei's ongoing refusal to provide adequate resources, and other circumstances as averred above.

186.     The additional express representation in Section 3.9.7 that "Owner is financially solvent, able to pay its debts as they mature and has sufficient working capital to complete its obligations under this Agreement" was false.

187.     As explained earlier, the truth was that Hoku Materials had a huge deficiency of $231 million in working capital when the MCSA was executed.

188.     Defendant Zhang, Defendant Paul, and Defendant Liu knew or should have known of the falsity of these statements and that the huge working capital deficiency represented a deep financial hole from which Hoku Materials and/or the Hoku Entities could not possibly recover.

189.    The $100 million in additional financing that Hoku Corporation did raise in financing with the collateral support of Defendant Tianwei from May to October 2011 as shown in Table 1 above fell far short of the $300 million the Executive Team told Defendant Tianwei it needed as reflected in the minutes of the June 7, 2011 Executive Team meeting.

190.    The importance of having substantial positive working capital to the ability of Hoku Materials and/or the Hoku Entities to pay the contractors for work performed in a timely manner is difficult to overstate.

191.    Working capital is the difference between current assets and current liabilities.  It is important for current assets to exceed current liabilities (i.e., a positive working capital) so that the company can meet its short term obligations, such as paying contractors for ongoing work.

192.    Working capital is the primary financial metric by which one can determine whether a company can meet its current obligations, and that is why the representation was made in Section 3.9.7 – so that IPI would enter into the contract believing that Hoku Materials had the ability to meet its obligations.

193.     "Current assets" are cash, accounts receivable and other liquid assets that can be readily converted to cash.

194.    As of September 2011, the Hoku Entities had only $10 million in current assets and it had less than $3 million in cash and cash equivalents.

195.    The polysilicon plant was not a current asset because it was fixed and illiquid and could not readily converted to cash.

196.     "Current liabilities" include accounts payable such as monies owed to contractors each month for work performed.

197. As of September 2011, the Hoku Entities' contractual obligations exceeded $90 million for work on the polysilicon plant, including $86 million for construction work in progress and $4 million for equipment purchases.

198. Additionally, as of September 2014, Hoku Materials had already defaulted under certain supply agreements, entitling those companies to terminate the agreements and demand that Hoku Materials immediately repay millions of dollars in prepayments.

199. The foregoing information concerning the financial condition of Hoku Materials and/or the Hoku Entities was known, or, with the exercise of reasonable care, would have been known to Defendant Zhang, Defendant Liu, Defendant Paul, and Defendant Tianwei at the time but was not reasonably known to IPI.

200. To understand the significance of attempting to operate with a negative working capital, one need look no further than the past experience and management decisions of Hoku Materials. Defendant Paul had the opportunity to participate firsthand the 2009 liquidity crisis since he held two positions as Vice President, Business Development and General Counsel during that crisis.

201. As shown earlier, Hoku management team realized in the summer of 2009 that it had a working capital deficiency of $37 million.

202. This was cause for alarm and Mr. Shindo, then the CEO and President, to characterize the negative working capital as a "short-term liquidity crisis" and to take the unwanted and drastic action of shutting down construction and procurement for months until the company could obtain a $50 million loan that by its terms required it be used to pay off debts owed contractors.

203. The obvious objective of the Hoku management team in shutting down construction and procurement for months was to protect the contractors from performing any more work for which Hoku Materials could not afford to pay, and correspondingly prevent Hoku Materials from incurring more debt when it did not have the ability to pay.

204. The board of directors and management team in place in the summer 2009 was substantially different from the directors and management team that Defendant Tianwei installed once it took control of the Hoku Entities on December 22, 2009.

205. As of September 2011, the board of directors installed by Defendant Tianwei (most of whom lived in China), together with the Chairman of the Board (Mr. Xia, who was also a vice-general manager for Defendant Tianwei) and the President of Hoku Materials (Defendant Zhang, who was also a vice-general manager for Defendant Tianwei), had allowed the working capital deficiency to explode to $231 million.

206. This $231 million deficiency as of September 2011, was more than six (6) times the $37 million deficiency that was deemed to a "liquidity crisis" in the summer of 2009.

207. The Hoku management team should have done the responsible thing and shut down construction well before September 2011 as they saw the hole getting deeper, but they chose instead to do the opposite: issue new contracts for more work, including the MCSA, pursuant to which IPI subsequently performed $7 million worth of work for which it has not yet been paid.

### i.   Implied Representation of Ability to Pay under Section 6.2 of the MCSA

208. Frequent and timely payment by Hoku Materials was critical to IPI's cash flow, which is why Section 6.2.2 of the MCSA provided that IPI would submit two (2) invoices each month (on the 1st and the 15th) and Section 6.2.6 required Hoku Materials to make payment within thirty (30) days from the receipt of an invoice.

209. The representation that Hoku Materials would pay IPI and that payment would be made within thirty (30) days necessarily includes an affirmative implied representation that Hoku had the ability and would have the ability, and a corresponding intent, to pay IPI's invoices as they came due.

210. Even if the MCSA did not contain the express and continuing representations in Section 3.9 as discussed above, the promise to pay IPI twice a month and within thirty (30) days, standing alone, constituted an affirmative implied representation of Hoku Materials' ability to pay.

211. Defendant Zhang, Defendant Paul, and Defendant Liu were all aware that the MCSA included a provision requiring Hoku Materials to pay and all three personally approved of the issuance of the MCSA to IPI.

212. To perform his duties in projecting cash flow, setting budgets and analyzing working capital, Defendant Liu was necessarily aware of all contractual provisions regarding payment either from reading the contract or from being informed of the payment provisions. Defendant Liu was aware of and agreed to the MCSA payment provisions because he needed to know the required timing and amount of payments to be able to prepare cash flow analyses and budgets for the Hoku Entities.

213. With full knowledge of Hoku Materials' new payment obligations under the MCSA, Defendant Liu personally approved of the issuance of the MCSA before Defendant Zhang executed it on October 6, 2011.

214. The implied affirmative representation that Hoku Materials (the "Owner") had the ability to pay IPI was false when made in light of Hoku's complete lack of resources as evidenced by negative working capital, the failure of Hoku to obtain the required level of financing, the

budget overrun, the failure to meet schedule, Tianwei's ongoing refusal to provide the needed resources, and other circumstances as averred above.

215.    Defendant Zhang, Defendant Paul, and Defendant Liu knew, or with the exercise of a reasonable degree of care under the circumstances, should have known at the time the misrepresentations were made and continuing thereafter that Hoku Materials did not have the ability and to pay IPI as required by the MCSA and that by making this implied affirmative representation, IPI was justifiable in relying on this representation in deciding to execute the MCSA and begin work under the MCSA.

**j.    Tacit Misrepresentation of Solvency upon Receipt of Structural Steel**

216.    Under the Steel Supply Agreement, IPI delivered millions of dollars of structural steel to the Plant beginning on or about September 14, 2011 and ending on or about October 7, 2011.

217.    Defendant Zhang, Defendant Paul, and Defendant Liu knew that IPI was delivering steel to the site at that time.

218.    Defendant Zhang, Defendant Paul and Defendant Liu accepted the deliveries of steel, and thereby made a tacit representation at that time that Hoku Materials was able to pay for the steel.

219.    The Defendants' tacit representation was false in light of Hoku Materials and/or Hoku Entities' complete lack of resources as evidenced by negative working capital, the failure of Hoku to obtain the required level of financing, the budget overrun, the failure to meet schedule, Defendant Tianwei's ongoing refusal to provide the financial resources Hoku Corporation and Hoku Materials needed, and other circumstances as averred above.

220. The Defendants knew or, with the exercise of reasonable care, should have known that their tacit representation was false at the time they oversaw and accepted the deliveries of steel made by IPI.

221. Over the next few months, the steel was bolted and/or welded to form the structural frame portion of the plant and extensive amounts of piping and equipment were installed on the steel frame.

222. By January 2012, the steel frame had become a permanent fixture that was part of the real property, and it would have been prohibitively expensive and damaging to remove the steel from the site.

223. IPI did not learn of Hoku's insolvency until after the steel frame had been installed. IPI could not have reasonably learned of this insolvency until after the steel frame had been installed.

224. Acting in reliance on the Defendants' tacit misrepresentation, IPI delivered the steel, and did not demand it back, believing that Hoku Materials had the ability to pay for the steel.

225. Hoku Materials failed to pay $2.7 million for the steel.

226. In addition to accepting delivery of the steel, Defendant Zhang, Defendant Liu, and Defendant Paul were well aware that IPI was continuing to perform work and deliver substantial materials under its contracts with Hoku Materials. The Hoku project management team was under the Defendants direct control and the team continued to accept IPI's work and materials and continued to issue change orders for new work. This conduct further supported the tacit representation made and or approved by Defendants that Hoku Materials had the financial resources to pay IPI.

227. In reliance on all the forgoing representations, IPI began work under the MCSA (and its associated Task Orders) in October 2011 and continued working on the Tank Farm Contract and the Steel Supply Agreement.

228. If IPI had been informed of Hoku Materials' true financial status, it would have stopped work on the Project, stopped delivery of the steel or demand that Hoku Materials return the steel that had been delivered.

**k. Hoku's Financial Condition from October 2011 to January 2012**

229. After IPI started the work on the MCSA, Hoku Materials' financial condition only got worse.

230. As of December 31, 2011, the Hoku Entities' working capital deficiency exceeded $221 million.

231. From November 2011 through January 2012, Defendant Tianwei arranged only two (2) more loans totaling $15.8 million, which represented $5 million per month. This amount of funding was used by Hoku Corporation primarily to pay for its own operations and was not nearly enough to get Hoku Corporation and Hoku Materials out of their deep working capital hole.

**l. Misrepresentations from October 2011 to April 2012**

i. Duty Arising from Continuing Nature of the Section 3.9 Representations

232. The representations under Section 3.9 of the MCSA were not only "express" but also "continuing."

233. Defendants Zhang, Paul, and Liu made the representations in the MCSA "continuing" so that IPI would know from day to day as it performed work that Hoku Materials continued to have the working capital and the ability to meet its obligations to pay IPI on a timely

basis. Defendants Zhang, Paul, and Liu made these representations in the MCSA to induce IPI to continue to work and supply materials under its contacts with Hoku Materials.

234. In light of the continuing nature of the Section 3.9 representations, Defendant Zhang, Defendant Liu, and Defendant Paul had a duty to inform IPI if at any point after the execution of the MCSA they became aware that the representations were false.

235. This duty to disclose the financial condition of Hoku Materials was buttressed by Section 3.3 of the MCSA, which, in the event Hoku Materials was late making payment, imposed an affirmative duty on Defendant Zhang, Defendant Paul, and Defendant Liu to "promptly furnish reasonable evidence to Contractor that Owner has adequate funds available or committed to fulfill Owner's payment obligations hereunder."

236. Moreover, Defendants exercised a high degree of power and control under the circumstances. As officers and directors of Hoku Corporation, Hoku Materials, and Defendant Tianwei, they had superior knowledge concerning and access to information showing the financial condition of Hoku Materials. Moreover, as Chinese businessmen, Defendant Liu and Defendant Zhang knew Chinese culture, language, and business practices. IPI by contrast had limited means for ascertaining the financial condition of Hoku Materials or the truth or falsity concerning a quota or transfer limit allegedly imposed by the Chinese government as alleged below.

        ii.    <u>October 2011: Defendants' Silence in the Face of Inquiries about Reasons for Delayed Payments</u>

237. On October 11, 2011, Ransom, working at IPI's home office in North Carolina, sent an email to Defendant Zhang. Ransom expressed concern that Hoku Materials was late in paying six invoices totaling in excess of $2.8 million. Ransom asked Defendant Zhang to

determine the reason payment was not being made: "Please do all you can to find out the catalyst for these past due payments."

238.    On October 17, 2011, Defendant Zhang forwarded Ransom's October 11 email to Defendant Liu with the message: "Sean, pls take care of this."  Defendant Zhang copied Ransom on the email.  That same day, Ransom emailed Defendant Liu: "Mr. Defendant Liu, please advise when I can expect payment.  My vendors and subcontractors are beginning to be concerned."

239.    These emails gave Defendant Zhang and Defendant Liu and opportunity to explain the truth concerning the "catalyst for the past due payments," which was that Hoku Materials was in serious financial trouble and did not have the resources or the ability to meet its obligations.

240.    Defendant Zhang and Defendant Liu remained silent, however, and did not respond to Ransom's request that they "Please do all you can to find out the catalyst for these past due payments."

241.    Despite (or because of) their knowledge that Hoku Materials and/or the Hoku Entities did not have the resources to pay IPI, Defendant Zhang and Defendant Liu failed to explain Hoku Material's true financial condition, in violation of the duty to disclaim the "continuing" representations in Section 3.9 and the duty to provide an explanation as required by Section 3.3.

242.    By remaining silent, Defendant Zhang and Defendant Liu intended that IPI believe that nothing was amiss with Hoku Materials' ability to pay IPI.

243.    The silence of Defendant Zhang and Defendant Liu in the face of express inquiries about the reason for Hoku Materials' lack of payment amounts to a misrepresentation under these circumstances.

iii.    November 2011:  Continuing Misrepresentations

244. On or about November 14, 2011, Ransom again spoke with Defendant Zhang by telephone and expressed concern that Hoku was late in making payment on several invoices.

245. As requested by Defendant Zhang, Ransom forwarded copies of the unpaid invoices to Defendant Zhang by email dated November 14, 2011. Defendant Zhang in turn emailed the past due invoices to Defendant Liu and requested that Hoku Materials keep paying IPI. Defendant Zhang copied Ransom on that email.

246. Two days later, on November 16, 2011, Ransom emailed Defendant Zhang to explain that he had seen the email to Defendant Liu and that he had "not received any input from Sean [Defendant Liu]," meaning he had not gotten any response to his October 17 email to Defendant Liu concerning when payment would be made. Ransom explained in his November 16 email that (a) Hoku was over 30 days late in paying $3.3 million, (b) the overdue amount would grow to $5 million plus the next week, (c) that he was getting calls from subcontractors and vendors concerning lack of payment. Again, Ransom asked for explanation: "Please advise when and what we can expect as far as payments."

247. To allay concerns of IPI and other contractors concerning nonpayment and to induce them to continue working or performing, Defendant Paul provided information to Defendant Zhang to relay to IPI and other contractors on November 18, 2011.

248. Defendant Paul intended that his message be conveyed to IPI's senior managers in North Carolina, so that IPI's management would rely on the information and continue working on the Project.

249. In keeping with Defendant Paul's intent and in order to comply with Defendant Paul's direction, at 10:03 p.m. EST on November 18, 2011, Defendant Zhang sent an email to Ransom in North Carolina. In his email, Defendant Zhang quoted Defendant Paul:

"The short of it is that it gets harder and harder to move U.S. Dollars from China to the U.S. as we approach the end of the year. By the end of the year, it is mostly used up. This isn't to say that there is nothing left to transfer. We're working hard with Tianwei to receive an allocation of what's left. Bottom line: Hoku/Tianwei is not a credit risk. There is just a timing issue."

250. Defendant Zhang's and Defendant Paul's objective was to convince IPI's management to continue working on the Project despite nonpayment. They wanted IPI to believe that Hoku Materials had funds committed to paying IPI and that the sole reason payment was not being made was government imposed quotas limiting the transfer of the money from China to the U.S.

251. The affirmative representations made by Defendant Paul and Defendant Zhang in the November 18, 2011 email were false in several respects.

252. First, the statement that U.S. Dollars had to be transferred from China to the U.S. for IPI to be paid was false.

253. The truth was that neither Hoku Corporation, Hoku Materials, nor Defendant Tianwei had ever moved dollars or yuan (a/k/a Renminbi or RMB) from China to the U.S. to fund the Plant. All the funding that Hoku Corporation and Hoku Materials had received from past financings (the Entrustment Loan and 22 subsequent loans) did not involve the transfer of dollars or yuan from China to the U.S. None of the Hoku Entities ever had an account in China and there was no need for money to be transferred from China. The loan proceeds were always disbursed from U.S. based accounts of a U.S. based bank (with one exception – a loan made from a bank Singapore) directly to the U.S. based bank accounts of Hoku Corporation or Hoku Materials in Hawaii.

254. Difficulty in moving funds from China to the U.S. was not the reason payment could not be made as November 18, 2011. The truth was that Hoku Corporation and/or Hoku Materials simply did not have the funds in the U.S., China, or anywhere in the world.

255. If Hoku Materials had adequate working capital to meet its obligations, as had been represented in Section 3.9 of the MCA, then Hoku Materials would have had the ability to pay IPI completely independent of Defendant Tianwei.

256. IPI was unaware of the loans to Hoku Corporation and Hoku Materials and how the financing worked.

257. Additionally, the statement in the November 18, 2011 email that "Hoku/Tianwei" was not a "credit risk" was false.

258. Defendant Paul and Defendant Zhang intended that IPI believe that IPI had no risk in extending further "credit" to Hoku/Tianwei by continuing to work on the project. IPI's contact was with Hoku Materials and IPI sent invoices to Hoku Materials believing, as the Defendants had represented that Hoku Materials had adequate working capital and its own financial resources to meet its payment obligations to IPI. IPI was not extending credit to Defendant Tianwei. To the extent Defendants Paul and Zhang were attempting to communicate on November 18, 2011 that Defendant Tianwei had committed to Hoku Materials to providing funding for payment of IPI, such representation was false because in fact no such commitment existed.

259. As a result of receiving and reasonably relying on this misrepresentation, IPI continued to work on the project and was not paid for its work.

260. The Defendants' statement that "There is just a timing issue" was intended to convey to IPI that the only issue was timing of payment, and to reinforce the representation that there was no risk in IPI extending further credit by continuing to work.

261. Thus, as contemplated by Section 3.3 of the MCSA, Defendants were representing that that Hoku Materials had "adequate funds available or committed" to fulfill its payment obligations and that the only issue was a delay in payment, not a lack of funds to make payment.

262. IPI's decision to rely on this representation was reasonable.

263. This representation was false in light of Hoku Corporation's and Hoku Materials' complete lack of resources as evidenced by negative working capital, the failure to obtain the required level of financing, the budget overrun, the failure to meet schedule, Defendant Tianwei's ongoing refusal to provide adequate resources to Hoku Corporation and Hoku Materials, and other circumstances as averred above.

264. At the time the representation was made to IPI, Defendants Zhang and Paul knew or, with the exercise of reasonable care, should have known that the statements were false. At the time the representation was made to IPI, Defendants Zhang and Paul owed IPI a duty not to provide false information to IPI in order to induce them to continue to provide services to Hoku Materials. By providing this false representation, Defendants Zhang and Paul breached their duty owed to IPI.

        iv.    <u>December 2011/January 2012:  Continuing Misrepresentations</u>

265. Four days later, on November 22, 2011, Ransom sent a lengthy email to Defendant Zhang in which he pointed out that IPI was owed $10 million in invoices and confirmed, the understanding "that Hoku's cash flow is adversely affected <u>only short term</u>" [underling added], confirming Ransom's understanding form Defendant Paul's November 18 email that "There is just a timing issue."

266. Ransom nevertheless requested further explanation in his November 22 email: "I do need something more concrete" and expressed concern that "I cannot get solid information as

to a payment schedule in full...This is referencing back to Sean Liu and my need to have something more concrete."

267. On December 5, 2011, Defendant Zhang represented to IPI's Chairman, Tony Kiehn, that the only reason for nonpayment was a "transfer limit issue," and that funds would be available by the Chinese New Year (January 23, 2012).

268. On December 8, 2011, Defendant Zhang again represented to Ransom by telephone that the Hoku Entities had the funds to make that payment and that all of IPI's invoices would be "paid out."

269. On December 16, 2011, IPI's Mike Jones (President) and Tony Kiehn (Chairman), met in person with Defendant Zhang and Xiaoming (Jeremy) Yin ("Yin") (president of Hoku Corporation since February 2011). Defendant Paul participated by video conference from Hawaii. Defendant Paul and Yin again represented to IPI that the funds were available to pay IPI and that it was just a matter of timing because of end-of-the-year quotas for the transfer of money from China.

270. Again, these ongoing representations were false in several respects and Defendant Zhang and Paul knew or, with the exercise of reasonable care, should have known that these ongoing representations were false.

271. First, there was no-end-of the year quota or transfer limit issue.

272. This explanation was used by the Defendants to obscure the true reasons payment was not being made, i.e., that Hoku Corporation had a huge working capital deficiency in excess of $200 million and that Defendant Tianwei continued to refuse to provide resources to Hoku Corporation and/or Hoku Materials to enable it to meet its obligations, despite seven (7) months of continual requests as shown by the confidential minutes of the meetings of Executive Team.

273.     Reasonably believing and relying on the representations that transfer limit issue would be solved by the Chinese new year (January 23, 2012) and that fund from China would then be freed up to pay IPI in full, IPI agreed in December to reduce the size of its workforce and continue to support the Hoku Entities with just one crew, with the expectation that it would re-mobilize a full construction effort once the funds were transferred from China to the U.S.

274.     Defendant Zhang and his project managers asked IPI and its electrical subcontractor, Lea Electric, LLC, to keep a team on the project to continue work at the direction of Hoku Materials.  Believing that Hoku Materials had funds to pay IPI and that it would be only a matter of time before payment would be made, Lea Electric also decided to keep a crew on the project.

275.     On January 5, 2012, Jones (IPI's President) organized a conference call in Pineville North Carolina between himself and Mike Roberts (Executive Vice President) on behalf of IPI and Defendant Zhang.  During that call, Defendant Zhang represented to Jones and Mr. Roberts the money to be paid IPI was "already set aside" and that it was "actually in deposit" in an account in China.

276.     This was false, because the truth was that there was no money "already set aside" or "actually in deposit" in China or anywhere else.

277.     On January 11, 2012, Defendant Zhang telephoned Kiehn (IPI's chairman) to inform him that the Hoku Entities had $50 million "allocated and approved" to be transferred to the U.S. to pay IPI for work completed to date and to complete construction of the project, and that the Hoku Entities wanted IPI to resume full construction activities in March to complete the project.

278.    This representation was false because in fact $50 million had not been "allocated and approved" for transfer to the U.S. for the purpose of paying IPI the amounts past due or for any future work.

279.    Around the Chinese New Year on January 23, 2012, the Defendants gave up the pretense that the only thing preventing payment was government imposed quotas restricting the transfer of moneys to the U.S. prior to the Chinese New Year.

280.    In fact, on January 27, 2012, Defendant Zhang explained to Jones by email that the quota problem had been solved.  But still no money appeared because the reason for nonpayment had nothing to do with a "quota problem," but had everything to do with Hoku Materials inability to make payment.

                    v.    February to April 2012

281.    From February to April 2012, IPI kept a small team on the Plant at the request of Defendant Zhang based on additional representations of Defendant Zhang and Defendant Liu.

282.    In February 2012, Defendants began to explain that in fact Hoku Corporation and Hoku Materials had to borrow the funds in order to pay IPI, and, as shown by the following series of communications, by the end of March they told IPI that they "had the cash" from a loan.

283.    On February 3, 2012, Defendant Paul and Defendant Liu told Kiehn that they were close to having monies transferred to the U.S. from 2-3 banks and that IPI should expect payment around the beginning of March 2012.

284.    On February 15, 2012 Defendant Liu told Kiehn in a telephone call that Hoku Corporation and/or Hoku Materials had secured or was about to secure $170 million in loans from 3 banks to pay IPI in full.

285. In early March 2012, IPI needed to provide to its auditors a confirmation that Hoku Materials had secured funds to pay IPI. To meet this request, on March 8, 2012 Defendant Liu emailed Mr. Kevin Ding at China Merchants Bank (New York) to confirm by email that the bank had approved $100 million loan to Hoku Corporation. Defendant Liu explained in his email that he needed to "show it to one of my vendor[s] [IPI] that who [sic] has concern about HOKU's ability to get fund[s] from the bank."

286. Mr. Ding responded the next day (March 9) by email, confirming that the bank had approved the $100 million loan.

287. On March 15, Defendant Zhang told Mr. Jones, Mr. Ransom, and Mr. Roberts that "Hoku has a total of $100 million set up to borrow from the new bank" with $50 million earmarked to pay off IPI and other debt.

288. On March 27, 2012, Ransom explained in an email to Yin, Defendant Liu, and Defendant Zhang, that IPI's electrical subcontractor (Lea Electric) was having difficulty making payroll because of lack of payment by Hoku Materials and that Lea Electric had to convince its bank the funds had been provided to Hoku Materials to make payment. Ransom asked Yin for "another confirmation of your [$100 million] LOC [line of credit]" to show to Lea Electric. Yin responded to Ransom and told him that LEA Electric could present the March 8-9 email string to its bank to assure that bank that the $100 million in funding was available to pay LEA Electric and IPI. Yin signed the email as "President" of Hoku Corporation.

289. On March 29, 2012, Yin confirmed to Kiehn in a telephone call that China Merchants Bank "has approved the monies and they have the cash."

290. On April 5, 2012, Kiehn met with Defendant Zhang. Defendant Zhang again told Kiehn that "the money had been approved in China" to pay IPI.

291.     Taken together, the representations made by Defendant Liu, Defendant Zhang, and Yin beginning in early March were intended to assure IPI, IPI's auditors, LEA Electric, and LEA Electric's bank that Hoku Corporation and/or Hoku Materials had secured $100 million in funding, that $50 million had been earmarked to pay IPI and others, and that the bank had "approved the monies," and that Hoku "had the cash," and were made in order to induce IPI to continue to work on the Project   These representations were false, however, and Defendants knew or, with the exercise of reasonable care, should have known that they were false.

292.     These representations were false because in fact the bank had not approved the monies, $50 million had not been earmarked to pay IPI and others, and Hoku Materials did not "have the cash" to pay IPI from China Merchants Bank or any other source.

293.     On or about April 25, 2012, Mr. Joe Smith (Hoku project manager) told Mr. Vee Godley (IPI's project manager) that in fact the bank had not approved the monies and Hoku did not have the cash to pay IPI.

294.     At that time, IPI and LEA Electric made the decision to start demobilizing their remaining crews from the project site.

295.     From February 2012 through demobilization, IPI incurred additional damages in labor, material, subcontractors, overhead and other costs totaling hundreds of thousands of dollar but does not make claim for those costs in this lawsuit.

296.     Several months later, in October 2012, Hoku Corporation borrowed $361k from Hemlock Semiconductor to pay for expenses that would be incurred by the Hoku Entities in filing bankruptcy.

297.     On July 2, 2013, Hoku Corporation, Hoku Materials, and Hoku Solar all filed for Chapter 7 bankruptcy ("Bankruptcy Date").

298.    IPI could not have reasonably have discovered all the facts of the Hoku Entities true financial condition and the fraudulent or negligent misrepresentations until after the bankruptcy was filed and Hoku's internal documents were made available to by the trustee for Hoku Materials.

299.    IPI has obtained voluminous paper and electronic files from the trustee for the Hoku Materials estate but not yet from the Hoku Corporation estate.

300.    The email files of Defendant Zhang, Defendant Liu, and Defendant Paul were not included in the voluminous files (both paper and electronic) of Hoku Materials produced by the trustee, though those files did include some of their emails.

301.    IPI reserves the right to amend the allegations and claims set forth herein once IPI has obtained and had a chance to review the complete email files of Defendant Zhang, Defendant Liu, and Defendant Paul.

**m.     $11 Million in Damages**

302.    For the Project as a whole, IPI submitted invoices totaling in excess of $30 million to Hoku Materials for the work performed and was paid approximately $17 million, leaving more than $13 million owed to IPI as of May 2012.

303.    Of the $13 million that remains unpaid, over $11 million was for work performed under the MCSA, Tank Farm Contract, and Steel Supply Agreement during October, November, and December 2011.

304.    IPI submitted invoices totaling in excess of $7 million for work performed under the MCSA during October, November, and December 2011 and these invoices remain unpaid today.

305.    IPI submitted invoices totaling in excess of $2 million for that work performed under the Tank Farm Contract during October, November, and December 2011 and these invoices remain unpaid today.

306.    IPI submitted invoices totaling in excess of $2 million for fabricated steel furnished under the Steel Supply Contract during October, November, and December 2011 and these invoices remain unpaid today.

307.    Instead of paying for IPI's work, the Hoku Entities ultimately filed for bankruptcy 1-1/2 years later on July 2, 2013.

**n.    IPI's Activities in North Carolina**

308.    The $17 million in payments that Hoku Materials did make to IPI (for $30 million in work) were sent by Hoku Materials to IPI in North Carolina.

309.    The $11 million in damages claimed by IPI herein were incurred in North Carolina.

310.    IPI's activities in North Carolina began with performing engineering services in its main office in North Carolina in September 2010 for the Vessel Fabrication Contract.

311.    IPI fabricated the vessel and shipped it to Idaho from its North Carolina shop.

312.    Beginning in April 2011, with the award of the large Tank Farm Contact, IPI shipped a substantial amount of welding and fabrication equipment from its shop in North Carolina to Idaho.

313.    IPI also began shipping large quantities of piping and other materials from North Carolina to Idaho for installation at the project.

314.    IPI also used funds from its bank account in North Carolina to pay the payroll of workers in Idaho (as well as in North Carolina).

315.    Throughout the duration of the project, IPI performed project management, engineering, and project support services from its main office in North Carolina.

316.    After the award of the MCSA in late September/early October 2011, IPI shipped millions of dollars of equipment, materials, and payroll from North Carolina to Idaho in reliance on the misrepresentations, solicitations, and requests of the Defendants.

**o.    Hoku's Bankruptcy**

317.    IPI filed liens on the Project in June 2012 claiming a total amount of in excess of $13 million.

318.    Hoku Corporation, Hoku Materials, and Hoku Solar all filed for Chapter 7 bankruptcy on July 2, 2013.

319.    The polysilicon Plant sold at auction in December 2013 for $8,300,000.

320.    After deducting the carve-out (12% or $996k) for the unsecured creditors and compensation to the trustee, $7,068,302.75 in net proceeds ("$7 million") is left for secured creditors in the Hoku Materials estate.

321.    The bankruptcy court entered an order on May 12, 2014 lifting the automatic stay and directing the Idaho state court "to determine the priority, extent, nature, validity and scope of all liens and security interests claimed against certain proceeds from the sale of bankruptcy estate property…" in *In Re: Hoku Materials, Inc.*, District Court for the Sixth Judicial District, County of Bannock, Case No. CV 2012-1123-OC ("State Court Action").

322.    The Hoku Corporation estate has little, if any assets.

323.    The State Court Action is the only proceeding currently underway in Idaho relative to the claims relating to the bankruptcy.

324.     Defendant Tianwei claims priority over IPI and numerous other contractors by virtue of its Deed of Trust recorded January 29, 2010.

325.     If Hoku Materials had adequate working capital to meet its obligations, it would have had sufficient current assets (cash and other liquid assets) to pay its current liabilities (including work by IPI and other contractors) and IPI and the other contractors would not be in position of having to fight for $7 million in proceeds from the sale of illiquid real property (the plant) with Defendant Tianwei claiming priority.

### p.     Potential Avoidance Claim by Trustee

326.     The bankruptcy trustee for Hoku Corporation gave notice by letter in the summer of 2014 that he might seek to avoid as constructively fraudulent a large number of payments that Hoku Corporation allegedly made directly to over 100 contractors or vendors for Hoku Materials.  Upon information and belief, these alleged payments total tens or hundreds of millions of dollars, and the trustee may attempt to recover from IPI certain payments allegedly made to IPI.  Upon information and belief, the trustee for Hoku Corporation contends that Hoku Corporation was insolvent at the time payments were allegedly made by Hoku Corporation to IPI and over 100 other contractors and vendors

327.     The trustee has not yet provided any details.  IPI (and, upon information and belief, other contractors) will strenuously fight any such avoidance claims on a number of grounds.  Any attempt by the trustee to avoid payments a fraudulent transfers should fail.  In the unlikely event the trustee should prevail in any such avoidance claim and recover from IPI any portion of the $17 million in payments made to IPI for $30 million in work, IPI seeks to recover such amounts from Defendants as additional damages because IPI would then be left unpaid for the work previously covered by the avoided payment(s) and performed in reliance on Defendants' misrepresentations.

These potential additional damages are hereinafter be referred to as "Contingent Avoidance Damages."

## COUNT I
## NEGLIGENT MISREPRESENTATION

328.    As alleged and explained earlier, the information Defendants' provided to IPI as part of representations made by the Defendants by their words and by their conduct from September 2011 to January 2012 was false in numerous respects, summarized as follows:

a.    The express and continuing representations set forth in Section 3.9 of the MCSA were false based on the financial condition of Hoku Materials as of September 2011 and after that date;

b.    The implied representation that Hoku had the ability to pay IPI's invoices as they came due under by virtue of the promise to pay IPI's invoices within thirty (30) days Section 6.2 of the MCSA was false;

c.    The tacit representation that Hoku Materials was solvent based on the Defendants' acceptance of deliveries was false;

d.    Defendants' silence in response to IPI's express inquiries as to the reason for delayed payment (a) on October 11, 2011 ("Please do all you can to find out the catalyst for these past due payments), (b) on October 17, 2011 ("Defendant Liu, please advise when I can expect payment. My vendors and subcontractors are beginning to be concerned"), and (c) on November 16, 2011 (IPI has "not received any input from Sean [Defendant Liu]….Please advise when and what we can expect as far as payments") was false;

e.  The information presented Zhang's November 18, 2011 email quoting Defendant Paul was false;

f.  The representation on December 5, 2011, that the only reason for nonpayment was a "transfer limit issue," and that funds would be available by the Chinese New Year (January 23, 2012) was false;

g.  The representation on December 8, 2011, that Hoku had the funds to make that payment and that all of IPI's invoices would be "paid out" was false;

h.  The representation on December 16, 2011, that the funds were available to pay IPI and that it was just a matter of timing because of end-of-the-year quotas for the transfer of money from China was false;

i.  The representation on January 5, 2012, that the money to be paid IPI was "already set aside" and that it was "actually in deposit" in an account in China was false; and

j.  The representation on January 11, 2012, that Hoku had $50 million "allocated and approved" to be transferred to the U.S. to pay IPI was false.

329.  Defendants Zhang, Paul, and Liu purposefully directed the false information and misrepresentations as alleged above to IPI in North Carolina to induce IPI to execute the MCSA, begin work on the MCSA and to continue working on the Plant.

330.  As officers, directors, and managers of Hoku Corporation and Hoku Materials, Defendant Paul Defendant Zhang, and Defendant Liu each had a pecuniary interest in the success or failure of Hoku Materials, the construction of the polysilicon plant, and the willingness of IPI to continue working on the Plant. In particular, their continued employment and compensation was tied to the success of the Plant.

331. As the majority owner of Hoku Corporation, Defendant Tianwei had a pecuniary interest in the success or failure of Hoku Materials, the success of the polysilicon plant, and the willingness of IPI to continue working on the Plant.

332. Defendants Zhang, Paul, Liu, and Tianwei each owed IPI a duty to exercise reasonable care in obtaining or communicating the information they provided to IPI as alleged above to induce IPI to execute the MCSA, begin work on the MCSA, and to continue working on the Plant.

333. Defendant Zhang participated directly in making all of these misrepresentations as shown by earlier allegations.

334. Defendant Paul directly participate, actively participated, and/or knowingly directed and approved of all the above misrepresentations as shown by earlier allegations.

335. Defendant Liu provided the information for and encouraged, actively participated in, and/or knowingly approved of all of these misrepresentations alleged herein.

336. Defendant Zhang, Defendant Paul and Defendant Liu failed to exercise reasonable care in determining the accuracy and truth of the information communicated to IPI in making the above representations.

337. IPI justifiably and reasonably relied in good faith on the above representations in executing the MCSA, beginning work on the MCSA, and continuing work on the Plant.

338. As a result of its reliance on the above misrepresentations, IPI incurred damages in labor, material, subcontractors, and other damages totaling in excess of $11 million from October to December 2011, which includes (a) in excess of $7 million for work on the MCSA, (b) in excess of $2 million for work on the Tank Farm Contract, and (c) $2 million in supplying structural steel under the Steel Supply Agreement.

339.     In the unlikely event the trustee for Hoku Corporation were to pursue and succeed in avoiding as fraudulent transfers any payments to IPI, the Defendants would also be liable for "Contingent Avoidance Damages."

340.     Wei Xia, acting within the scope of his employment as Vice General Manager for Defendant Tianwei provided the information for and directed, actively participated in, and/or knowingly approved of all of these misrepresentations alleged herein.

341.     At all relevant times as alleged herein, Defendant Zhang was acting within the scope of his employment as Vice General Manager for Defendant Tianwei.

342.     At all relevant times as alleged herein, Defendant Liu was acting within the scope of his employment for Defendant Tianwei.

343.     Defendant Tianwei is liable of the tortious conduct of Mr. Xia, Defendant Zhang, and Defendant Liu based on the doctrine of respondeat superior.

344.     If Defendants Zhang, Paul, Liu and Tianwei had exercised reasonable care, they would not have issued the MCSA and would have caused Hoku Materials to stop construction work well before September 30, 2011 until Hoku Materials was properly capitalized and had the resources to pay for its debts to IPI and other and others as they matured.

345.     Alternatively, if a Defendant Zhang, Defendant Paul, and Defendant Liu had exercised reasonable care and explained to IPI the truth that the Hoku Entities had a huge working capital deficiency, that Hoku Materials did not have the ability to pay IPI according to the terms of the MCSA, that Hoku Materials was in fact was entirely dependent on Tianwei, and that Tianwei continued to refuse to provide the necessary resources for Hoku Materials to be able to meet its obligations, IPI would not have executed the MCSA and would have stopped work on the Project and saved in excess of $11 million.

346.     The losses suffered by IPI was a single and indivisible harm caused by the actions of all the Defendants as it would be difficult or impossible to segregate and quantify damages caused by each misrepresentation.

347.     Defendant Zhang, Defendant Paul, Defendant Liu, and Tianwei are jointly and severally liable to IPI for damages in such amount as may be proven at trial, plus pre-judgment interest and attorney's fees as allowed by law.

**COUNT II**
**RECKLESS/FRUADULENT MISREPRESENTATION AND/OR CONCEALMENT**

348.     The averments set forth in the foregoing paragraphs are incorporated by reference.

349.     Defendants, as officers and directors of Hoku Materials and Hoku Corporation, were charged by law and by virtue of their positions with the above Hoku Entities, with actual knowledge of the financial condition of Hoku Materials.

350.     Defendants owed IPI a duty not to provide false information as a result of reckless and conscious disregard for the truth of the information provided, in order to induce IPI execute the MCSA, begin work on the MCSA, and continue work on the Plant.

351.     IPI alleges, alternatively, that not only did Defendants Zhang, Paul, Liu, and Tianwei fail to exercise reasonable care as alleged in Count I, but that they acted with a reckless and conscious disregard for the truth or falsity of the misrepresentations referenced in Count I and with a complete disregard for the consequences to IPI.

352.     Defendants Zhang, Paul, Liu and Tianwei intended to deceive IPI.

353.     The misrepresentations in Count I were reasonably calculated by Defendants Zhang, Paul, Liu and Tianwei to deceive IPI.

354. IPI was in fact was deceived by the misrepresentations referenced in Count I as shown by its reasonable and justifiable reliance on the misrepresentations as alleged herein.

355. As such, Defendants' misrepresentations as alleged in Count I rose to the level of fraud and/or fraudulent concealment.

356. Defendant Zhang, Defendant Paul, Defendant Liu, and Tianwei are jointly and severally liable to IPI for damages in such amount as may be proven at trial, punitive damages, plus pre-judgment interest and attorney's fees as allowed by law.

**COUNT III**
**UNFAIR OR DECEPTIVE TRADE PRACTICES ACT**

357. The averments set forth in the foregoing paragraphs are hereby incorporated.

358. The misrepresentations as alleged in Count I were substantially injurious to IPI because IPI relied on such misrepresentations in deciding to execute the MCSA, begin work on the MCSA, and to continue working on the Project.

359. Defendants' misrepresentations were unethical, deceptive and/or unfair because they had the capacity or tendency to deceive IPI.

360. IPI reasonably relied on Defendants' misrepresentations in deciding to execute the MCSA, begin work on the MCSA, and continue working on the Project and incurred damages that would have been avoided if Defendants had been truthful about Hoku Material's financial condition.

361. IPI is entitled to judgment jointly and severally against Defendants Zhang, Paul, Liu and Tianwei under the North Carolina Unfair or Deceptive Trade Practices Act (North Carolina Code Section 75-1.1 et. seq.) for (a) damages incurred by IPI in excess of $11 million for work in October, November, and December 2011 plus Contingent Avoidance Damages, (b) three times the amount assessed by the jury as mandated by NC Code Section 75-16: "if damages are assessed in

such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict," (c) attorney's fees as allowed by NC Code Section 75-16.1 or as otherwise allowed by law, and (d) pre-judgment interest as allowed by law.

**WHEREFORE,** IPI prays that Court as follows:

1. That judgment be entered jointly and severally against each Defendant for compensatory damages and punitive damages in such amount as may be proven at trial;

2. That the Court award IPI treble damages as mandated by the Unfair or Deceptive Trade Practices Act;

3. That the Court award IPI pre-judgment interest and attorney's fees as mandated or allowed by law;

4. For a Trial by Jury on all triable issues; and

5. For such other relief as may be just and equitable.

Respectfully submitted this 2nd day of January, 2015.

/s/ Elizabeth A. Martineau
Elizabeth A. Martineau
NC Bar # 26394
Martineau King PLLC
PO Box 31188
Charlotte, NC  28231
704-247-8520 – Ph
704-943-0543 – Fax
emartineau@martineauking.com

Attorney for the Plaintiff

Daniel J. Weber
Georgia Bar No. 744869

DelCampo Weber & Grayson LLC
5455 Chamblee Dunwoody
Atlanta, Georgia 30338
Telephone: (404) 808-6670
Email: Dan@dwglawfirm.com

Attorney for the Plaintiff

# **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served upon all counsel of Record by depositing a copy of the same in an official depository of the United States mail in a postage-paid envelope, or pursuant to the ECF service if appropriate, addressed as follows:

Jack S. Gjording
James B. Smith
Gjording Fouser PLLC
121 N. 9th Street
P.O. Box 2837
Boise, ID  83702
jgjording@gfidaholaw.com
jsmith@gfidaholaw.com
*Attorneys for Tao Zhang and Dayi Liu*

Howard Holderness
Morgan Lewis & Bockius, LLP
One Market, Spear Street Tower
San Francisco, Ca 94105
hholderness@morganlewis.com

Celeste K. Miller
McDevitt & Miller LLP
420 West Bannock St.
P.O. Box 2564
Boise, Idaho 83701
ck@mcdevitt-miller.com
*Attorneys for Scott Paul.*

John William Ormand, III
Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
P.O. Box 1800
Raleigh, NC  27602

This the 2nd day of January, 2015.

/s/ Elizabeth A. Martineau