IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14-CV-537-RJC-DCK

| | |
|---|---|
| INDUSTRIAL PIPING, INC.,<br>    Plaintiff,<br><br>vs.<br><br>TAO (MIKE) ZHANG, DAYI (SEAN) LIU, SCOTT PAUL, TIANWEI NEW ENERGY HOLDINGS CO., LTD. and DOES 1-10,<br><br>    Defendants. | **MEMORANDUM OF PLAINTIFF IN SUPPORT OF THE MOTION TO AMEND THE COMPLAINT** |

NOW COMES PLAINTIFF, Industrial Piping, Inc. (hereinafter "Plaintiff" or "IPI"), by and through its undersigned attorneys, to submit this memorandum in support of the motion to amend the complaint to add proposed Count IV, another theory of recovery against Defendants pursuant to North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75.1 et seq. ("UDTPA"), which asserts that the acts of Defendants to grossly undercapitalize the Hoku entities and to then undertake additional debt by contracting with Plaintiff and allowing Plaintiff to perform millions of dollars of unpaid work constituted "unfair acts or practices" in violation of the UDTPA. The facts which support proposed Count IV have already been pled in the First Amended Complaint (Dkt. No. 37).

## I. PROCEDURAL HISTORY

Plaintiff amended its complaint as a matter of right on January 2, 2015. (See Am. Compl., Jan. 2, 2015, Dkt. No. 37.) The Amended Complaint includes three counts: negligent misrepresentation (Id. ¶¶ 328-34), reckless/fraudulent misrepresentation and/or concealment (Id. ¶¶ 348-356), and violation of the UDTPA (Id. ¶¶ 357-361).

1

Defendants sought an extension of time to answer or otherwise respond, which this Court granted. (Order, Jan. 12, 2015, Dkt. No. 39.) On February 4, 2014, the individual Defendants Zhang, Paul, and Liu moved to dismiss the amended complaint or transfer venue. (Dkt. No. 47, Dkt. No. 49.) These motions remain pending. Joinder of the issues under Local Civil Rule 16.1 had not yet occurred.

Plaintiff now moves to amend the complaint to add Count IV, which sets forth an alternative theory of recovery under the UDTPA. A true and accurate copy of Count IV is included herein as **Exhibit A**.

## II. FACTS

Plaintiff, a company with a principal place of business in Pineville, North Carolina, entered into various contracts from 2010 to 2011 with Hoku Materials, Inc., a company formed to manufacture polysilicon. (Am. Compl. ¶ 8, ¶ 89, ¶ 99, ¶ 104, ¶107, ¶ 110, Jan. 2, 2015, Dkt. No. 37.) Hoku Materials, Inc. ("Hoku Materials") was a wholly owned subsidiary of Defendant Hoku Corporation. (Id. ¶ 4, ¶ 8.) Defendant Tianwei New Energy Holdings Co., Ltd. ("Tianwei") owned sixty percent (60%) of the stock of Hoku Corporation. (Id. ¶11.) Tianwei is People's Republic of China Company, which is part of a state-owned conglomerate known as the Badoing Tianwei Group, Ltd. (Id.) "Hoku entities" as used in this memorandum refers to Hoku Materials and/or Hoku Corporation.

### A. *History of the Hoku Entities and Tianwei*

In 2006 to early 2007, Hoku Corporation shifted its focus away from the development and manufacture of component fuel cells and instead began to focus on (a) the manufacture of polysilicon (used in the manufacture of solar panels) and (b) the installation of arrays of solar panels. (Id. ¶ 26.) Hoku Corporation, a holding company, did not expect to generate significant

revenue until construction was completed for a manufacturing plant in Idaho that would enable Hoku Materials to begin producing polysilicon. (Id. ¶ 31, ¶ 7.) Construction of the plant began in March of 2007. (Id. ¶ 37.)

On July 30, 2009, Hoku Corporation announced that it had taken "steps to temporarily slow construction and procurement efforts" for the polysilicon plant to preserve cash while seeking additional working capital. (Id. ¶ 59.) At that time, Hoku Corporation had a working capital deficiency of $37 million, which its president characterized as a "short-term liquidity crisis." (Id. ¶ 58, ¶ 202.)

On or around September 28, 2009, Defendant Tianwei entered into a stock purchase agreement with Hoku Corporation to recapitalize Hoku Corporation and put the "liquidity crisis" behind them. (Id. ¶ 61.) As part of this agreement, Tianwei agreed to provide a two year term loan of $50 million to Hoku Corporation. (Id. ¶ 63(b).) On December 22, 2009, Defendant Tianwei closed on the stock purchase agreement and the loan proceeds were disbursed. (Id. ¶ 64.) Hoku Materials then executed a "Subsidiary Guarantee," pursuant to which Hoku Materials guaranteed the obligations of Hoku Corporation and agreed to secure the agreement by providing liens on all assets, including the plant (primary asset). (Id. ¶ 66.) This agreement led to the recording of a Deed of Trust dated January 29, 2010 in favor of Tianwei. (Id.)

Tianwei took control of the Hoku entities and appointed officers and directors. (Id. ¶¶ 67-68.) Three of the individuals appointed by Tianwei are Defendants to this action. Plaintiff alleges that individual Defendant Tao (Mike) Zhang served concurrently in the following roles:

- Vice General Manager of Tianwei (60% grandparent company of Hoku Corporation) from 2008 to July 2, 2013
- Director of Hoku Corporation (parent company of Hoku Materials) from July 2010 to July 2, 2013.

3

- Interim President of Hoku Materials from October 20, 2010 to 2012.

(Id. ¶ 13.) Plaintiff alleges that individual Defendant Dayi (Sean) Liu served the following roles:

- Accounting Manager for Tianwei
- Vice President of Finance for Hoku Corporation from April 2011 to March 31, 2012
- Responsible for managing the finances for Hoku Materials

(Id. ¶ 15.) Plaintiff alleges that individual Defendant Scott Paul served the following roles:

- Director for Hoku Corporation from April 1, 2010 to March 31, 2012
- Director for Hoku Materials from April 1, 2010 to March 31, 2012
- Chief Executive Officer of Hoku Corporation from April 1 to July 2, 2013
- Chief Executive Officer of Hoku Materials from April 1 to July 2, 2013
- President of Hoku Corporation prior to February 28, 2011

(Id. ¶ 17.)

### B. Hoku Material entered into six (6) contracts with Plaintiff beginning on or around May 5, 2010.

First, on December 10, 2010, Defendant Paul on behalf of Hoku Materials executed a $506 thousand dollar contract with Plaintiff wherein Plaintiff agreed to fabricate and supply a vessel for the plant. (Id. ¶ 90.) An officer of Defendant Tianwei also executed this contract even though that officer was not an officer or director for the Hoku entities. (Id. ¶ 91.)

Second, on or around April 7, 2011, Hoku Materials contracted with Plaintiff for IPI to fabricate and install process piping in the tank farm area of the plant for payment in excess of $13 million, including change orders. (Id. ¶ 99.) Third, on or around July 1, 2011, Hoku Materials contracted with Plaintiff for Plaintiff to supply structural steel for use in the plant for payment in excess of $9 million. (Id. ¶ 104.) Fourth, on or around August 19, 2011, Hoku Materials contracted with Plaintiff for Plaintiff to supply design support for a fire protection system for the plant for $224 thousand. (Id. ¶ 107.) Fifth, by contract dated on or around September 16, 2011, Hoku Materials hired Plaintiff to design support for the plant in an amount of $43 thousand. (Id. ¶ 108.)

4

Sixth and finally, through a contract dated on or around September 27, 2011, Hoku Materials, as owner of the plant, hired Plaintiff to provide $9 million worth of miscellaneous construction services pursuant to a Master Construction Services Agreement ("MCSA"). (Id. ¶ 110.) Individual defendant Zhang executed the MCSA on October 6, 2011 on behalf of Hoku Materials at the direction and approval of Defendants Paul and Liu. (Id. ¶ 118.)

C. *Gross Undercapitalization*

During the entire time that Tianwei controlled Hoku Corporation from December 22, 2009 to July 2, 2013, unbeknownst to Plaintiff, Hoku Corporation or its subsidiaries never achieved positive working capital, despite the initial $50 million loan and 22 subsequent loans arranged by Tianwei. (Id. ¶ 148, ¶ 154.)

On April 14, 2011, the Hoku management team presented a comprehensive operating and budget plan to the Hoku Corporation Board of Directors that stated that Hoku Corporation would need to raise $214 million in financing to reach the objective of producing polysilicon by October 2011. (Id. ¶ 160, ¶ 156.) Defendants Paul and Zhang participated in biweekly or weekly meetings, as part of the Executive Team for the Hoku entities, where they discussed the need to raise hundreds of millions in financing. (Id. ¶ 172-175.) Defendant Liu worked with the Executive Team to prepare budgets, make cash flow projections, and to attempt assure that Hoku Materials had sufficient working capital meet its obligations. (Id. ¶ 179.) By June 7, 2011, Defendants knew that the Hoku entities needed $300 million in capital. (Id. ¶ 177.)

From April 1 to October 30, 2011 Hoku Corporation secured only $100.4 million in financing from Defendant Tianwei (Id. ¶ 164), well short of the $300 million needed to adequately capitalize.

**D.** *Proposed Count IV*

By September of 2011, around the time the MCSA was executed, Defendants Zhang, Paul, Liu and Tianwei knew that Hoku Materials had a working capital deficiency of $231 million dollars and that Hoku Materials could not meet its existing contractual obligations, much less its obligations under new contracts. (Id. ¶ 181, ¶¶ 170-180, ¶ 197.) Additionally, as of September 2014, Hoku Materials had already defaulted under supply agreements (unrelated to Plaintiff), which entitled those companies to terminate their agreements with Hoku Materials and demand that Hoku Materials immediately repay millions of dollars in prepayment. (Id. ¶ 198.) Despite this gross undercapitalization, on October 6, 2011, Defendant Zhang, with the approval of Defendants Paul and Liu, executed the MCSA with Plaintiff wherein Hoku Materials agreed to pay $9 million for more construction services. (Id. ¶ 118, ¶ 110.)

Plaintiff now brings proposed Count IV on the basis that Defendants Zhang, Paul, and Liu should have shut down construction (as the capital deficit ballooned) so that they could get a capital infusion. (Id. ¶ 207; See Exhibit A, ¶ 370.) Instead, these Defendants acted unfairly in violation of the UDTPA when they decided to issue the $9 million MCSA *on top of* the ongoing millions of dollars of work that Plaintiff was already doing on other contracts and in light of the gross undercapitalization. (See Exhibit A, ¶ 370, ¶ 373.)

October 6, 2011, the date that Defendant Zhang executed the MCSA, was a critical juncture in time. The Hoku entities had already failed to meet their objective of beginning to manufacture polysilicon by October of 2011. (Am. Compl. ¶ 158.) They had grossly inadequate financing (Tianwei in particular was not committed to providing the need working capital) and no ability to manufacture of polysilicon and thus no means of "getting out of the hole" that they had created. (Id. ¶¶ 169-170, ¶ 164, ¶ 175.) If Defendants Zhang, Paul, and Liu had stopped construction and

not issued the MCSA, then Plaintiff would not have subsequently incurred $7 million in unpaid invoices for work performed pursuant to the MCSA. (See Exhibit A, ¶ 377 (citing to Am. Compl. ¶ 207 and ¶¶ 306-306).) Likewise, if Defendants Zhang, Paul, and Liu had shut down construction on or about October 6, 2011, Plaintiff would not have subsequently incurred $4 million in unpaid invoices on the tank farm contract and steel supply agreements for work performed in October, November, and December of 2011. (See Exhibit A, ¶ 376 (citing to Am. Compl. ¶¶ 306-306).)

Defendants Paul, Zhang, and Liu acted unfairly by engaging Plaintiff to perform millions of dollars' worth of work under the MCSA, the tank farm contract, and the steel supply agreement to further their own individual pecuniary interests because their "compensation and continued employment" depended upon moving forward with construction of the plant.. (See Exhibit A, ¶ 369 (citing to Am. Compl. ¶ 182).) Proposed Count IV details more specifically the motivation of these Defendants including hundreds of thousands of dollars bonuses and incentives which only vested for Defendants Paul and Zhang if they remained employed by Hoku Corporation by March 31, 2012. (See Exhibit A, ¶ 369.)

### E. Bankruptcy

On July 2, 2013, Hoku Materials and Hoku Corporation filed for bankruptcy. (Id. ¶ 297.) Plaintiff remains unpaid for more than $11 million for work performed under the MSCA and two other contracts for work performed during October, November and December of 2011. (Id. ¶ 303.)

Defendant Tianwei now claims priority over Plaintiff and several other contractors by virtue of its Deed of Trust recorded January 29, 2010. (Id. ¶ 324.)

7

## III. LEGAL STANDARD

Rule 15(a)(2) of the Federal Rules of Civil Procedure provide that a party may amend its pleading through leave of the Court. "The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). The requirement of justice in Rule 15(a)(2) means:

> [T]hat there is a strong policy to permit amendment, and that the court should grant leave to amend with considerable liberality. The court's broad discretion in this regard must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities.

Moore's Federal Practice and Procedure § 9.51 (citing Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003).

The grant or denial of leave to amend the complaint rests within the discretion of the district court. Scott v. Family Dollar Stores, Inc., 733 F.3d 105, 121 (4th Cir. 2013) (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)). A district court's denial of leave to amend is appropriate when "(1) 'the amendment would be prejudicial to the opposing party;' (2) 'there has been bad faith on the part of the moving party;' or (3) 'the amendment would have been futile.'" Scott, 733 F.3d at 121 (quoting Laber v. Harvey, 438 F.3d 404, 426-27 (4th Cir. 2006)).

### 1. *Prejudice*

"Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing." Laber v. Harvey, 438 F.3d 404, 427 (4th Cir. 2006). With respect to the amendment's nature, "[a] common example of a prejudicial amendment is one that 'raises a new legal theory that would require the gathering and analysis of facts not already considered by the defendant.'" Id. (quoting Johnson v. Oroweat Foods Co., 785 F.2d 503, 510 (4th Cir. 1986)) (alterations omitted). By contrast, "[a]n amendment is not prejudicial . . . if it merely adds an additional theory of recovery to the facts already pled." Id.

2. *Futility*

"Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards" -- that is, if it "fails to satisfy the requirements of the federal rules." Scott, 733 F.3d at 128 (quoting Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011) (internal quotation marks omitted)).

3. *Bad Faith*

Bad faith sufficient to warrant denial of leave to amend includes situations where a plaintiff seeking to amend its complaint undertakes "contradictory factual positions in order to match their evolving legal theories." Id. at 126.

## IV. ARGUMENT

The interests of justice favor allowing Plaintiff to amend the complaint. None of the grounds that courts in the Fourth Circuit use to deny leave to amend a complaint are present. Plaintiff's proposed amendment merely adds an alternative theory for recovery under the UDTPA using facts already pled in prior pleadings. (See Exhibit A.) Plaintiff's current complaint already contains a claim for relief under the UDTPA, Count III, which is based, in part, on Defendants' alleged misrepresentations. (See Am. Compl. ¶¶ 357-361, Dkt. No. 37.) Proposed Count IV asserts relief for "unfair acts or practices" under the UDTPA *independent* of any misrepresentation of Defendants. (See Exhibit A.) .

### A. *Nature of the proposed amendment.*

Proposed Count IV alleges that the Defendants' decision in October of 2011 to allow IPI to continue working on the construction of the plant when Hoku Materials was grossly undercapitalized (negative $231 million in working capital) constituted an unfair act. (SeeExhibit A, ¶ 372.) Additionally, the Defendants' decision to issue the MCSA, which Zhang executed on

9

October 6, 2011, constituted an unfair act or practice when the Hoku entities were grossly undercapitalized. (Exhibit A, ¶¶ 373.) Proposed Count IV further alleges that the Defendants engaged in unfair acts under the UDTPA when they did not shut down or curtail ongoing construction and performance by Plaintiff when it was clear to Defendants that Hoku Materials did not and would not have the means necessary to pay for goods/services already provided by Plaintiff and that the Hoku entities would not be able to pay for the additional services to be provided by Plaintiff. (Exhibit A, ¶¶370, ¶¶ 362-36-.) Plaintiff subsequently performed in October, November, and December in excess of $7 million of work under the MCSA for which it was not paid and $4 million under other agreements for which it was not paid. (Id.¶¶ 376-377).

### B. *Defendants are not prejudiced by the proposed amendment.*

This case is in its nascent stages. Discovery has not yet begun because as there has been no joinder of the issues due to Defendants' motions to dismiss. See Local Civil Rule 16.1. The proposed amendment is not prejudicial because it "merely adds an additional theory of recovery to the facts already pled." Laber v. Harvey, 438 F.3d 404, 427 (4th Cir. 2006).

### C. *The proposed amendment is not futile.*

The proposed amendment is actionable. To recover under the UDTPA, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).

The UDTPA is a creation of statute and an action brought pursuant to the UDTPA is therefore sui generis. Concrete Serv. Corp. v. Investors Grp., Inc., 79 N.C. App. 678, 679-80, 340 S.E.2d 755, 756-57 (1986). "The legislation creating these actions expanded existing common law remedies." Concrete Serv. Corp., 79 N.C. App. At 685, 340 S.E.2d at 760 (citing Marshall v.

Miller, 302 N.C. 539, 276 S.E. 2d 397 (1981). "The narrow limits of the law of fraud do not describe the limits of what may constitute unfair or deceptive practices." Id. at 686, 340 S.E.2d at 761 (further citation omitted). "A precise definition of unfair or deceptive acts is not possible, but whether a particular act is unfair or deceptive depends on the facts surrounding the transaction and the impact on the marketplace." Concrete Serv. Corp., 79 N.C. App. at 685, 340 S.E.at 760 (citing Bernard v. Central Carolina Truck Sales, Inc., 68 N.C. App. 228, 314 S.E. 2d 582, disc. rev. denied, 311 N.C. 751, 321 S.E. 2d 126 (1984)). A practice is considered "unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." South Atlantic, 284 F.3d at 535. (quoting Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397, 403 (1981)). It is a "highly fact-specific inquiry." South Atlantic Ltd. P'ship of Tennessee, L.P. v. Riese, 284 F.3d 518, 535 (4th Cir. 2002). "[T]he fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others." Id.

Plaintiff's claim in Count III of UDTPA is based, in part, on misrepresentations from Defendants. Proposed Count IV alleges that Defendants' alleged conduct, *independent of the alleged misrepresentations*, was sufficiently egregious to be "unfair" under the UDTPA.

Proposed Count IV is similar to the facts presented in is South Atlantic Ltd. P'ship of Tennessee, L.P. v. Riese, 284 F.3d 518 (4th Cir. 2002). There, the defendant, a real estate developer, hired plaintiff, a general contractor, to construct an apartment community. Id. at 523. The jury found that the defendant developer knew from other projects that the framing contractor hired by the plaintiff had a "reputation for poor workmanship." The jury found that the defendant developer had deliberately decided against revealing this knowledge to the plaintiff general

contractor. Id. at 536-37. The jury also found that the defendant "no legal obligation to tell [the general contractor] about [the framing subcontractor]." The court found that the defendant's silence did not constitute a misrepresentation. Id. at 537.

The court nevertheless ruled that defendant's silence was "unethical, unscrupulous and directly injurious to consumers" under the UDTPA Id. at 538. "As the Supreme Court of North Carolina has observed, the obligations imposed by the UTPA 'create a cause of action broader than traditional common law actions.' Marshall, 276 S.E.2d at 402." Id. The court reasoned that "For a company to know that its general contractor was about to employ a substandard and shoddy subcontractor, and nevertheless deliberately withhold such information from the general contractor, is the essence of unscrupulous behavior. As such, we see [defendant] Simpson's non-disclosure of Today's Contractor's poor reputation and deficient past performance *as sufficiently egregious* to constitute an unfair trade practice under the North Carolina UTPA." Id. at 537-38 (emphasis added).

South Atlantic Limited Partnership supports the theory that liability may arise for "unfair acts" in "sufficiently egregious" circumstances when a defendant deliberately withholds critical information even in the absence of a duty to speak. Id. Here, in proposed Count IV, Plaintiff alleges that Defendants engaged in "unfair acts" under the UDTPA in that they were unscrupulous ("doing things that are wrong, dishonest" per Meriam Webster), unethical ("not in conformity with moral norms or standards of professional conduct" per Black's Law Dictionary, 9th ed.), and/or "substantially injurious" ("harmful; tending to injure" per Black's Law Dictionary, 9th ed.) in several respects.

The "unfair acts" which support Count IV have already been pled. To wit, individual Defendants Zhang, Paul and Liu participated in Tianwei's strategy of keeping Hoku Corporation

12

and Hoku Materials perpetually undercapitalized and ultimately grossly undercapitalized as of September 30, 2011. (Am. Compl.¶¶ 155-181, Dkt. No. 37.) Inadequate capitalization can be unscrupulous, unethical and substantially injurious. See, e.g., Commonwealth Mut. Fire Ins. v. Edwards, 32 S.E. 404, 406 (N.C. 1899) ("The prevailing tendency to corporate absorption cannot be ignored, and it is the increasing duty of the State, while giving to all corporations the equal protection of its laws, to equally protect its citizens against corporate abuses…. One of [the] great dangers is the risk of insolvency arising from the want of any personal liability of their stockholders, and the uncertain, and perhaps fictitious, nature of their assets. Some are afflicted with what may be called 'congenital' insolvency. They are born insolvent, capitalized into insolvency at the moment of their creation, and eke out a precarious existence in an apparent effort to solve the old paradox of living on the interest of their debts. Such corporations are not only intrinsically dangerous, but lay the foundation for an unjust suspicion of all other corporate bodies."); Richmond v. Indalex Inc., 308 F. Supp. 2d 648, 656 (M.D. N.C. 2004) (inadequate capitalization is one of the factors that courts will examine to determine in the first prong of the analysis of whether to pierce the corporate veil). As the Fifth Circuit has stated, "The fact that a subsidiary maintains what amounts to a "zero balance," and relies exclusively upon another entity to service its debts, is strong evidence that the subsidiary lacks an independent identity. Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 447 F.3d 411, 420 (5th Cir. 2006). This describes the relationship between Tianwei and Hoku Corporation/Hoku Materials. (See Am. Compl. ¶ 164, ¶ 168.)

Given their knowledge, the Defendants should have curtailed construction well before October 6, 2011. (Exhibit A, ¶ 379.) They certainly should not have issued the MCSA, pursuant to which Plaintiff subsequently performed $7 million worth of work for which it has not been paid.

13

(Id. ¶ 377.) It was unfair for Defendants to allow vendors and contractors to continue to provide goods and services (E.g. Am. Compl. ¶¶ 216-228[1] and ¶¶ 304[2]) while knowing that Hoku Materials was grossly undercapitalized and would not be able to pay for those goods and services (Exhibit A, ¶¶ 370-372.) It was even more unfair that the Defendants should "put their foot on the accelerator" and issued the MCSA for $9 million worth of work. Id. ¶ 373.

That Defendants should have shut down or curtailed construction is demonstrated by the former management team's decision to declare a "short term liquidity crisis" when the working capital deficiency hit "only" $37 million and shut down construction until additional working capital was obtained. (Id. ¶ 379.) It was unscrupulous for the Defendants to allow a business the size of Hoku Materials to continue operating and incurring new debt when it has hit a working capital deficiency of more than a quarter of a billion dollars, $231 million, which is six fold the magnitude of the 2009 crisis that caused construction to halt). (Id. ¶¶364-371.)

Similarly, Defendants' actions were unfair because they were "substantially injurious" because they led to IPI not being paid for tens of millions of dollars of work performed in October, November, and December 2011. (Id. ¶¶ 376-377.) This result could have been avoided as alleged in proposed Count IV if the Defendants had acted in a scrupulous and ethical manner and curtailed construction or adequately capitalized Hoku Materials. (See Exhibit A, ¶¶ 376-77.)

In sum, proposed Count IV is grounded facts already pled that support recovery based on Defendants' alleged actions, which were unfair independent of any representation made by the Defendants.

---

[1] Plaintiff is owed $2.7 million for structural steel deliveries from September 14, 2011 ending on or about October 7, 2011
[2] Plaintiff is owed $7 million for work performed under the MCSA.

*D. There is no bad faith.*

Plaintiff seek to amend the complaint in good faith. The proposed amendment is based on facts set forth in current Amended Complaint, of which Defendants already have notice. For the reasons described above, proposed Count IV is actionable.

**V.     AFFIRMATION**

Counsel for Plaintiff and counsel for individual Defendants Paul, Zhang, and Liu have attempted to confer in good faith in accordance with Local Civil Rule 7.1 and could not resolve the matters set forth in this motion at the time of filing. Service has not yet been accomplished on Defendant Tianwei.

**VI.    CONCLUSION**

For these reasons, Plaintiff respectfully moves this Court to GRANT the motion to amend the complaint.

Respectfully submitted this the 23rd day of February, 2015.

/s/ Elizabeth A. Martineau
Elizabeth A. Martineau
NC Bar # 26394
Martineau King PLLC
PO Box 31188
Charlotte, NC  28231
Telephone: (704) 247-8520
Fax: (704) 943-0543
Email: emartineau@martineauking.com
*Attorney for the Plaintiff*

/s/ Daniel J. Weber
Daniel J. Weber
Georgia Bar No. 744869
DelCampo Weber & Grayson LLC
5455 Chamblee Dunwoody
Atlanta, Georgia 30338
Telephone: (404) 808-6670
Email: Dan@dwglawfirm.com
*Attorney for the Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum of Plaintiff in Support of the Motion to Amend the Complaint was served upon all counsel of record by depositing a copy of the same in an official depository of the United States mail in a postage-paid envelope, or pursuant to the ECF service if appropriate, addressed as follows:

Jack S. Gjording
James B. Smith
Gjording Fouser PLLC
121 N. 9th Street
P.O. Box 2837
Boise, ID 83702
jgjording@gfidaholaw.com
jsmith@gfidaholaw.com
*Attorneys for Tao Zhang and Dayi Liu*

Howard Holderness
Morgan Lewis & Bockius, LLP
One Market, Spear Street Tower
San Francisco, Ca 94105
hholderness@morganlewis.com

Celeste K. Miller
McDevitt & Miller LLP
420 West Bannock St.
P.O. Box 2564
Boise, Idaho 83701
ck@mcdevitt-miller.com

John William Ormand, III
Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
P.O. Box 1800
Raleigh, NC 27602
jormand@brookpierce.com

*Attorneys for Scott Paul*

This the 23rd day of February, 2015.

/s/ Elizabeth A. Martineau
Elizabeth A. Martineau
NC Bar # 26394
Martineau King PLLC
PO Box 31188
Charlotte, NC 28231
Telephone: (704) 247-8520
Fax: (704) 943-0543
Email: emartineau@martineauking.com
*Attorney for the Plaintiff*