IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14-CV-537-RJC-DCK

| | |
|---|---|
| INDUSTRIAL PIPING, INC.,<br>    Plaintiff,<br><br>v.<br><br>TAO (MIKE) ZHANG, DAYI (SEAN) LIU,<br>SCOTT PAUL, TIANWEI NEW ENERGY<br>HOLDINGS CO., LTD. and DOES 1-10,<br><br>    Defendants. | **PLAINTIFF'S RESPONSE IN<br>OPPOSITION TO PAUL'S MOTION<br>TO DISMISS OR IN THE<br>ALTERNATIVE MOTION TO<br>TRANSFER VENUE** |

NOW COMES PLAINTIFF, Industrial Piping, Inc., by and through its undersigned attorneys, to submit this Response in opposition to Defendant Scott Paul's Motion to Dismiss First Amended Complaint or, in the alternative, to Transfer Venue.

## I.    ADDITIONAL PLED FACTS THAT PAUL FAILED TO BRING TO THE COURT'S ATTENTION

Unbeknownst to IPI, as of September 30, 2011, Hoku Corporation/Materials was grossly undercapitalized, with a working capital deficiency equal to negative $231 million. Paul and his Executive Team estimated on June 7, 2011 that Hoku Materials needed $300 million to be properly capitalized. Tianwei continually refused to provide the necessary capital and, as of September 30, was not committed to doing so. (FAC ¶¶ 116, 167, 175-178.)

Paul was CEO and director for both Hoku Corporation and Hoku Materials at all relevant times during 2010, 2011, and 2012. Paul was president of Hoku Materials up to October 20, 2010. (FAC ¶ 17.) On or about May 5, 2010, his project management team working under him, initially contacted IPI in North Carolina to see if IPI would perform work on the project. (See Roberts Decl. ¶ 5, submitted for jurisdiction/venue purposes *only*) This led to the Vessel Fabrication Contract,

which Paul signed on behalf of Hoku Materials. (See Roberts Decl. ¶ 6, submitted for jurisdiction/venue purposes *only*.) Paul knew IPI was located in North Carolina. (FAC ¶¶ 17, 18, 68, 87, 89-90, 94.)

As an attorney, former general counsel, and member of the Hoku Materials Executive Committee (responsible for giving directions to Zhang), Paul reviewed and approved the terms of the Tank Farm Contract, Steel Supply Agreement, and MCSA. He intended and/or reasonably expected that the MCSA would be sent to IPI in North Carolina, and that IPI would rely on representations and warranties in the contract, including those in Section 3.9. He also intended and/or reasonably expected that IPI would rely on the Section 6.2.6 implied representation that Hoku Materials had the ability to pay invoices within 30 days. (FAC ¶¶ 75, 82, 85, 96, 100, 101, 105, 114, 117, 124 - 130, 208.)

Section 3.9 of the MCSA set forth "express and continuing representations and warranties," including that "Owner is financially solvent, able to pay its debts as they mature **and has sufficient working capital to complete its obligations under this Agreement.**" (FAC ¶ 114.)

The representations was made "continuing" so that IPI could know from day to day, that Hoku Materials was maintaining a positive working capital to meet its obligations. (FAC ¶¶ 125, 210.) Defendants should have maintained a positive working capital so it would have, at all times, sufficient Current Assets to pay Current Liabilities. The importance of working capital is explained at ¶¶ 190 - 192 in the First Amended Complaint.

Section 6.2.6 of the MCSA required Hoku Materials to make payment within thirty (30) days from the receipt of an invoice. This promise to make payments necessarily included an implied representation that Hoku Materials had the financial resources to pay invoices in a timely manner. (FAC ¶¶ 208-209.)

Even if it were shown that Paul did not specifically read and approve the terms of the MCSA, he nevertheless approved the issuance of the MCSA knowing that it must contain, as all construction contracts do, a representation that Hoku Materials would pay IPI's invoices in a timely manner. By approving the issuance of the MCSA, he approved the implied misrepresentation that Hoku Materials had the ability to meet it payment obligations. (FAC ¶ 211, 215.) IPI received the MCSA in North Carolina and relied on Sections 3.9 and 6.2.6 in deciding to execute the MCSA on September 28, 2011. (FAC ¶¶ 116, 120; see also Ransom Decl. ¶ 18, submitted for jurisdiction/venue purposes only.)

As the chair of the Executive Team meetings, Paul was in regular contact with Liu and Zhang, and knew about Ransom's email inquiries. He also knew, as reflected by the minutes of those meetings, that Hoku Materials did not have the resources to be financially independent and that Tianwei was not committed to providing those resources. (FAC ¶¶ 127, 247-250.)

Leading up to November 18, 2011, when he communicated to jobsite personnel the false statements in his email of that date, Paul discussed strategy with Zhang and Liu to formulate the statements. He fully intended and/or reasonably expected that his statements on November 18, 2011 would be forwarded to IPI's senior managers in North Carolina and that they would rely on them. (FAC ¶¶ 246-250; Ransom Decl. ¶ 25, submitted for jurisdictional purposes *only*)

Paul had strong reasons to conceal Hoku Materials' financial condition and to induce IPI to execute the MCSA and induce IPI to continue working on the project with his November 18, 2011 emails. Zhang, Liu, and Paul had a pecuniary interest in IPI continuing to work on the project as their compensation and continued employment depended on the success of the project. (FAC ¶ 182.) Because Paul contends that motivation for Paul to mislead IPI has not been alleged (see page 15 of Paul's Memorandum), in ¶ 369 of Count IV IPI expounds on the allegation in ¶ 182 as

follows.  See Exhibit A to the Mot. to Amend ¶ 369, Dkt. No. 56.   As of October 6, 2011, Paul

and Zhang already owned tens of thousands shares of Hoku Corporation.  For fiscal year 2012

(ending March 31, 2012), Paul and Zhang, respectively, had a base salaries of $350,000 and

$175,000 per year, long term incentive bonuses of $200,000 and $100,000, safety bonuses of

$50,000 and $25,000, and restricted stock grants valued at $210,000 and $110,000, which would

vest only if Paul and Zhang remained employed by Hoku Corporation as of March 31, 2012.

Between the two of them, they had over $1 million riding on the prompt completion of the Plant.

Id.

        As a result of Paul's misrepresentations and unfair acts, IPI continued during October,

November, and December 2011, after the execution of the MCSA to (a) perform project

management, engineering, and project support services from North Carolina (FAC ¶¶ 259, 274,

303), (b) shipped a substantial amount of company owned welding and fabrication equipment from

its shop in North Carolina to Idaho (FAC ¶¶ 316, 312) (c) purchased large quantities of piping and

other materials in North Carolina and shipped them from North Carolina to Idaho (FAC ¶¶ 221,

313), and (d) used funds from its bank account in North Carolina to pay the payroll of workers in

Idaho and North Carolina (Id. ¶ 314).  Accord Brakesfield Decl,¶¶ 5-9, submitted for jurisdictional

purposes only.  These activities cost IPI millions of dollars. (Id. ¶ 316)

        IPI makes clear in multiple allegations that it is claiming damages only for October,

November, and December (FAC ¶¶ 282, 303-306, 338 & 361).  Plaintiff makes no claim for

damages that happened after January 1, 2012.  IPI demobilized all but a small crew by the end of

December 2011 (Id. ¶273).   IPI does not claim the cost of the small crew it kept on site because

Defendants, for the first time, began to explain in February and March 2012 that Hoku Materials

actually did not have funds but that loans were in the works. (Id. ¶¶ 273, 283-85)

IPI does not claim any damages after January 1, 2012 for the crew it kept on site because in late January 2012 (FAC ¶ 295), IPI started to learn that Hoku Materials in fact did not have funds in any account that were being held up. (Id. ¶¶ 279-293.)

## II. THIS COURT ABSOLUTELY HAS PERSONAL JURISDICTION OVER PAUL

The dual jurisdictional requirements of long arm statute and due process collapse into a single inquiry in North Carolina. Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001).

The Fourth Circuit has articulated the principles that are relevant to the facts of this case:

> [I]t is not necessary that the defendant ever actually enter the forum State's territory; so long as the defendant has purposefully directed his activities toward the forum State, and the litigation arises from those activities, due process is satisfied.
>
> The Court has noted three reasons why a State should be able to assert jurisdiction over non-residents who purposefully direct their activities toward that State. First, a State has an obvious interest in providing a forum for its resident to redress injuries inflicted by non-residents. Second, it would be unfair not to allow jurisdiction where the defendant has derived benefits from the activities directed toward the forum State. Finally, modern methods of transportation and communication make it much less onerous now for a person to defend himself in a remote forum. [cit. omitted][underlining added].

Pittsburgh Terminal Corp. v. Mid Allegheny Corp., 831 F.2d 522, 525-26 (4th Cir. 1987).

Thus, courts have consistently found personal jurisdiction where a defendant "purposefully directed" tortious conduct (including misrepresentations) toward the resident of another state and that resident suffers harm in that state. See ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 177 (4th Cir. 2002)(where an nonresident "submitted false information on credit applications to two Virginia companies…intending for Virginia businesses to rely on this information," the exercise of jurisdiction in Virginia was "eminently reasonable and consistent with due process"). See also

5

Vishay Intertechnology, Inc. v. Delta Int'l Corp., 696 F.2d 1062, 1068-69 (4th Cir. 1982); Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp., 640 F. Supp. 1411, 1427 (E.D.N.C. 1986); Blue Mako, Inc. v. Minidis, 472 F. Supp. 2d 690, 701 (M.D.N.C. 2007)(where an nonresident corporate officer negotiated contract prior to signing, and sent false and misleading or inaccurate information to North Carolina to induce plaintiff to sign the contract, the court concluded it "clearly has jurisdiction" over the officer).

All three reasons are present why North Carolina should be able to assert jurisdiction are present here.  With regard to Counts I, II, and III, IPI has adequately alleged that Paul purposefully directed his activities to North Carolina: (a) knew IPI was located in North Carolina, (b) intended the misrepresentations in the MCSA and in his November 14, 2011 email would be relied on by IPI in North Carolina, and (c) knew that any harm to IPI would be in North Carolina at its principal place of business. With regard to Count IV, Paul's joint decisions with Zhang and Liu to not curtail construction and to issue the MCSA to IPI in North Carolina despite Hoku Materials being grossly undercapitalized, were directed at IPI in North Carolina so that IPI would continue working.

III.     **IPI HAS STATED PROPER CLAIMS AGAINST PAUL AND, AS SUCH, PAUL'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM SHOULD BE DENIED.**

A. **Paul Owed a Duty of Care to IPI to Support Negligent Misrepresentation.**

The North Carolina Supreme Court first adopted Section 552 of the Restatement (Second) of ("Torts Information Negligently Supplied for the Guidance of Others") in 1988.  It provides:

> One who, in the course of his business, profession or employment, or in any other tranFACtion in which he has a pecuniary interest, supplies false information for the guidance of others in their business tranFACtions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

6

<u>Marcus Bros. Textiles v. Price Waterhouse, LLP</u>, 350 N.C. 214, 218, 513 S.E.2d 320, 323-24 (1999)(citing <u>Raritan River Steel Co. v. Cherry, Bekaert & Holland</u>, 322 N.C. 200, 367 S.E.2d 609 (1988)).

**B. <u>Paul is Personally Liable for the Negligent Misrepresentation.</u>**

It is well established in North Carolina that an officer or director of a corporation is personally liable for torts he commits or in which he participates.

> It is thoroughly well settled that a man is personally liable for all torts committed by him, consisting in misfeasance-as fraud, conversion, acts done negligently, etc.- notwithstanding he may have acted as the agent or under directions of another. And this is true to the full extent as to torts committed by the officers or agents of a corporation in the management of its affairs. The fact that the circumstances are such as to render the corporation liable is altogether immaterial. The person injured may hold either liable, and generally he may hold both as joint tort-feasors. <u>Corporate officers are liable for their torts, although committed when acting officially.</u> They are liable for their torts regardless of whether the corporation is liable.

<u>Minnis v. Sharpe</u>, 198 N.C. 364, 151 S.E. 735, 737 (1930) (emphasis added). The court further explained that an officer is personally liable if he "contributed to, or helped to bring about, the injury; that is to say, he must be a participant in the wrongful act. Some knowledge and participation, actual or implied, must be brought home to him." <u>Id.</u>

North Carolina courts have adopted and applied these rules. <u>See</u> <u>e.g.</u>, <u>Wilson v. McLeod Oil Co.</u>, 327 N.C. 491, 518, 398 S.E.2d 586, 600 (1990); <u>Palomino Mills v. Davidson Mills Corp.</u>, 230 N.C. 286, 292, 52 S.E.2d 915, 919 (1949); <u>Oberlin Capital, L.P. v. Slavin</u>, 147 N.C. App. 52, 57, 554 S.E.2d 840, 845 (2001)(director held responsible for negligent misrepresentation).

Paul cites <u>Sempione</u> at page 9 of his Memorandum for the proposition that there was not sufficient nexus between Paul and IPI to support liability, but there the Fourth Circuit found sufficient nexus. 75 F.3d at 962-63. The Fourth Circuit adopted § 531 of the Restatement (Second) of Torts (1977) even though the Maryland Supreme Court had not done so. Section 531 provides

7

for liability where one who makes a misrepresentation to a known person "if he knows that the misrepresentation is likely to reach that person" and that person is likely to rely on it.  Id. at Comment f.  Though Over 30 states have adopted Section 531, the Fourth Circuit has observed that "we know of no state that has rejected them [§ 531 principles]."  See also, In re Hughes Creek, Inc., 980 F.2d 727 (4th Cir. 1992)(adopting 531 where West Virginia had not done so).   Paul's conduct clearly meets the § 531 requirements since, as explained previously, it is alleged that Paul knew IPI was in North Carolina and intended that the MCSA and his November 18, 2011 email reach IPI in North Carolina to for the purpose of inducing IPI to rely on the misrepresentations.

C.  The Economic Loss Rule ("ELR") Does Not Bar Negligent Misrepresentation.

There are a number of reasons the ELR should not apply to IPI's negligent misrepresentation claims.   First, § 552 expressly gives a remedy only for "pecuniary loss." "Pecuniary loss" (a loss of money) and "economic loss" (monetary loss) mean the same thing per Black's Law Dictionary (10th ed. 2010).  Comment (a) to §552 explains that liability under §552 does not extend to "negligent misrepresentation that results in physical harm."  Moreover, the Supreme Court was fully aware of the ELR when it adopted § 552.   Second, Defendants had a strong pecuniary interest in inducing IPI to execute the MCSA and continuing work.  Thus, § 552, gave rise to a duty independent duty for them to "exercise reasonable care or competence in obtaining or communicating the information" concerning financial condition of Hoku Materials to IPI.  Nowhere does the MCSA state or require the Defendants to exercise reasonable care in obtaining or communicating financial information to IPI.  Rather, that duty arises independently under § 552.

North Carolina courts recognize an independent duty under § 552 on the part of officers of a company and others to provide "accurate, or at least negligence free, financial information" in

8

connection with tranFACtions. <u>Kindred of N. Carolina, Inc. v. Bond</u>, 160 N.C. App. 90, 584 S.E.2d 846, 852-53 (2003)(officer/seller of a company owed "a duty to provide accurate, or at least negligence-free financial information" to purchaser of company and was liable for financial statement that showed $20,000 profit when company in fact had $10,000 loss."); <u>Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc.</u>, No. 109CV00018, 2010 WL 3943754, at *2 (M.D.N.C. Oct. 7, 2010)("under North Carolina law, a party to a contract owes the other contracting party a separate and distinct duty not to provide false information to induce the execution of the contract."); <u>Raritan River Steel Co. v. Cherry, Bekaert & Holland, 322 N.C. 200, 203, 367 S.E.2d 609, 611 (1988)</u>(accountants liable to plaintiff who sold steel to and extended credit to manufacturer "overstatement of net worth" in an audit report. §552 imposed "upon defendants a duty of care." Availability of breach of contract claim against the manufacturer did not bar the negligent misrepresentation claim); <u>Marcus Bros. Textiles v. Price Waterhouse, LLP, 350 N.C. 214, 513 S.E.2d 320 (1999)</u>(accountants liable to plaintiff who sold fabric to and extended credit to retailer which subsequently filed bankruptcy with a $300,000 debt where accounts had misrepresented the financial condition). See also, an analogous case where liability arose when defendant misrepresented whether it had the ability to perform under contract. <u>Ada Liss Grp. v. Sara Lee Corp.</u>, No. 06CV610, 2010 WL 3910433, at *1 (M.D.N.C. Apr. 27, 2010), (breach of contract, negligent misrepresentation, fraud, and UDTPA claim where defendant "made material misrepresentations either without any intent of carrying out its obligation to mark Products, or with reckless disregard as to whether marking would be done, whether it could be done, and whether it would be effective." Allegations set forth an adequate basis to find a separate and independent duty owed by the defendant outside the contractual relationship.).

In <u>T.W.T. Distrib., Inc. v. Johnson Products Co.</u>, 966 F. Supp. 2d 576 (W.D.N.C. 2013), Judge Conrad found that a claim for negligent misrepresentation survived a Motion to Dismiss based on the plaintiff's allegations that the defendant "represented and promised to [Plaintiff] that it intended for its contract with [Plaintiff] to continue, at minimum, for the duration of the five-year term of the warehouse space lease." Plaintiff alleges that Defendant made such <u>representations with reckless indifference as to their truthfulness</u>; that Plaintiff justifiably relied on those representations to its detriment by leasing warehouse space for a five-year term; and that Plaintiff was damaged as a result. Those allegations state a claim for negligent misrepresentation sufficient to survive a Motion to Dismiss." <u>Id</u>. at 581-82 (emphasis added).

In the present case, IPI alleges that Paul participated in the misrepresentations with reckless indifference as to their truthfulness. (FAC ¶¶ 14, 18, 350-351). Thus, the claim for negligent misrepresentation should survive the Motion to Dismiss under the decision in <u>Johnson Products</u>.

**D. <u>The Question of Justifiable Reliance is a Question for the Jury</u>.**

At pages 10-11 of his Memorandum, Paul asks this court to find as a matter of law that IPI could not have relied on Paul's misrepresentations. First, IPI will address Paul's contention at the bottom of page 11 that as of March 2012, China Merchant Bank had approved a $100 million loan. IPI does not seek to hold any of the defendants responsible for anything that happened after January 1, 2012. IPI claims only damages for costs incurred in October, November and December 2011. (FAC ¶¶ 282, 303-306, 338 & 361.) It expressly alleges that it does not claim any costs beginning January 1, 2012. The reason is that IPI discovered for the first time in late January that the alleged transfer restriction imposed by the Chinese government was not the only reason that Hoku Materials' funds in China were not transferred to the U.S. (FAC ¶ 279.) The real reason was that Hoku Materials never had funds in China as had been

10

represented. The "transfer restriction" was a fabrication to string out IPI and keep it working. Thus, Paul's unsubstantiated statement at the bottom of page 11 of its Memorandum that IPI knew in late 2011 that Hoku Materials did not actually possess the funds is contrary to the allegations. (FAC ¶¶ 114, 249, 267-69)

First, the question of reliance "is one for the jury, unless the facts are so clear as to permit only one conclusion." Forbis v. Neal, 361 N.C. 519, 526-27, 649 S.E.2d 382, 387 (2007). "It is only in exceptional cases that the issue of reasonable reliance" may not be submitted to the jury. Camacho v. Flowers, 723 S.E.2d 173 (N.C. Ct. App. 2012). This is not an "exceptional case" where "the facts are so clear as to permit only one conclusion." Second, IPI had no idea as to how Hoku Materials was or was not capitalized. It had no knowledge that Tianwei, acting through Paul, Liu, and Zhang were arranging a series of just-in-time loans to pay only immediate operational and construction costs, without allowing Hoku Materials achieve a positive working capital balance.

Third, IPI had no access to the Executive Team 23 meetings that Paul, Zhang, and Liu were continuously discussing from May 2011 to January 2012 the fact that Hoku Materials did not have the resources to achieve "financial independence," meaning they did not sufficient current assets to pay current liabilities (i.e., positive working capital) to pay contractors if Tianwei were to pull the plug on the just-in-time loans. Fourth, IPI did not have any reason for concern because the strategy of relying on just-in-time loans allowed Defendants to make payments up to September 2011 on a timely basis, thereby masking the underlying structural problem of a huge working capital deficiency that developed by September 2011. The working capital deficiency balloon finally burst in October after the pressure grew too large, and Tianwei put on hold further just-in-time loans.

Fifth, the wording in the Section 3.9 representations encouraged IPI not to make any further inquiry. Section 3.9 provided "express" and continuing "representations and warranties." Hoku Materials drafted the contract, and included the term "express" ("clearly and unmistakably communicated; stated with directness and clarity." Black's Law Dictionary (10th ed. 2014)) to encourage IPI to not question the "representations and warranties." Sixth, by including the term "representations" in addition to "warranties," Hoku Materials conveyed that IPI should rely on the express representation in executing the contract. "Representation" means "a presentation of fact — either by words or by conduct — made to induce someone to act, esp. to enter into a contract." Black's Law Dictionary (10th ed. 2014). Warranty, on the other hand, means "an express or implied promise that something in furtherance of the contract is guaranteed by one of the contracting parties...in general a warranty differs from a representation in four principal ways...(3) a warranty is an essential part of a contract, while a representation is usu. only a collateral inducement. Black's Law Dictionary (10th ed. 2014).

Seventh, Hoku Materials was not a public company. Even if Ransom had checked the SEC filings (and knew how to do so) before executing the MCSA on September 28, 2011, the September 30, 2011 Quarterly Report was not filed until almost two months later on November 25, 201. Only the Defendants could speak to Hoku Materials' current financial condition as of the end of September 30, 2011 from their superior knowledge (FAC ¶ 236), and they had already done that in the Section 3.9 by making "express and continuing" representations. Eighth, even if the September 30, 2011 report (filed November 25, 2011) were available at the time of execution of the MCSA, it would have represented that Tianwei "has committed to provide the Company financial support for its ongoing operations, planned capital expenditures and debt service requirements until at least April 1, 2012." As of September 30, 2011 this was clearly false given

12

that Tianwei was not committed to providing the needed capital. The September 30 quarterly report also stated: "If the Company is unable to generate revenue, secure additional financing or structure credit terms with its vendors, the Company will be forced to curtail construction of the Polysilicon Plant."

Paul cites <u>Angell v. Kelly</u>, 2006 WL 3479010, *8 (M.D.N.C. 2006) for the proposition that IPI had an obligation to conduct a search for SEC filings. Paul mischaracterizes <u>Angell</u>, which is easily distinguished on the facts. In advance of closing, Defendant (IHS) provided plaintiff with some SEC documents and warranted in the contract: "Section 6.4: IHS 'has furnished [Plaintiffs] ... with a correct and complete copy' of all SEC documents from a certain date." Despite knowing that they did not have all the SEC documents, plaintiffs proceeded with the closing. <u>Angell</u> actually supports that IPI's reliance was reasonable in citing and discussing a number of cases that have held that either "a plaintiff can rely on a defendant's representation when the defendant has superior access" or "a defendant can be liable for a fraudulent statement's harm, even when a plaintiff could determine the falsity on his own, if he induces the plaintiff to forgo independent investigation….A mere representation by itself can be "reasonably calculated" to induce forbearance." <u>Id</u>. at *6.

"Many decisions strongly support the view that accepting and relying on a definite and positive representation, without attempting to verify it, is reasonable unless the recipient has reason to doubt its accuracy." <u>Robert G. Byrd, Misrepresentation in North Carolina</u>, 70 N.C. L. Rev. 323, 333-34 (1992). The North Carolina Supreme Court has set forth the rationale:

> [T]he law does not require a prudent man to deal with everyone as a rascal and demand covenants to guard against the falsehood of every representation which may be made as to facts which constitute material inducements to a contract. There *334 must be a reasonable reliance upon the integrity of men or the tranFACtions of business, trade and commerce could not [prosper]

<u>Id</u>.

In the case *sub judice*, Paul's representations that were "positive and definite" in stating that "Owner is financially solvent, able to pay its debts as they mature and has sufficient working capital to complete its obligations under this Agreement." These representations were "reasonably calculated to induce forbearance" as contemplated by the rule stated in <u>Angell</u> above and IPI had no reason to doubt their accuracy.

For these reasons, this is not an "exceptional case" where "the facts are so clear as to permit only one conclusion" so as to justify a holding as a matter of law that IPI could not have reasonably relied on the misrepresentations in the MCSA.

### E. <u>The ELR Does Not Bar IPI's UDTPA Claim.</u>

In 2012, the Fourth Circuit concluded: "[T]he North Carolina courts have never addressed whether UDTPA claims are subject to the ELR." It also cautioned: "as a court sitting in diversity, we should not create or extend the North Carolina common law." <u>Ellis v. Louisiana-Pac. Corp.</u>, 699 F.3d 778, 787 n.5 (4th Cir. 2012). This Court should not apply the ELR to the UDTPA for several reasons. IPI alleges that Paul's participated in the misrepresentations with reckless indifference as to their truthfulness, and that the Defendants committed the unfair acts with a reckless indifference and conscious disregard to the harm that they would be caused to IPI. Reckless indifference is an aggravating circumstance that takes the UDTPA claim out of the ambit of the economic loss rule. The ELR does not apply where there is an aggravating circumstance such as reckless indifference. <u>See</u> Judge Conrad's decision in <u>Johnson Products Co.</u>, 966 F. Supp. 2d at 981-82; <u>Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc.</u>, No. 109CV00018, 2010 WL 3943754, at *2 (M.D.N.C. Oct. 7, 2010).

Many North Carolina decisions have allowed both a breach of contract remedy and a UDTPA claim.  See, e.g., Bernard v. Cent. Carolina Truck Sales, Inc., 68 N.C. App. 228, 230, 314 S.E.2d 582, 584 (1984)(UDTPA claim "is a distinct action apart from fraud, breach of contract, or breach of warranty").  United Labs., Inc. v. Kuykendall, 335 N.C. 183, 184, 437 S.E.2d 374, 375 (1993)(UDTPA claim was not barred by the fact that the plaintiff had a breach of contact remedy because UDTPA "was designed to supplement common law remedies").  Most jurisdictions deciding the issue has held that the ELR does not apply to UDTPA type claim.  Coker v. DaimlerChrysler Corp., 172 N.C. App. 386, 387-88, 617 S.E.2d 306, 308 (2005).  Two federal district courts have considered the issue at some length and both concluded that the ELR does not bar a UDTPA claim under North Carolina law.  In re MyFord Touch Consumer Litig., No. C-13-3072 EMC, 2014 WL 2451291, at *1 (N.D. Cal. 2014)(UDTPA "gives rise to a duty independent of the contract and therefore should not be barred by the economic loss rule.");  In re Saturn L-Series Timing Chain Products Liab. Litig., 2008 WL 4866604, at *18 (D. Neb. 2008)(even in class action product defect case against automobile manufacturers, "this Court will not apply a common law doctrine [ELR] to terminate a cause of action specifically created by North Carolina's legislature unless clearly directed to do so by North Carolina's courts.").

Additionally, the decision Bussian v. DaimlerChrysler Corp., 411 F.Supp.2d 614, 625, 627 (M.D.N.C.2005), where the ELR was held to bar a class action product defect claim under UDTPA, was expressly "limited its decision to cases such as the instant case involving allegations of a defective product where the only damage alleged is damage to the product itself and the allegations of unfair trade practices are intertwined with the breach of contract or warranty claims."  Bussian's progeny should also be so limited. Moreover, the decisions from other jurisdictions that Bussain relied on have subsequently been overruled or not be viewed as good law.  Flagg Energy

15

Dev. Corp. v. Gen. Motors Corp., 244 Conn. 126, 154, 709 A.2d 1075, 1088 (1998) was expressly

overruled by Ulbrich v. Groth, 310 Conn. 375, 78 A.3d 76 (2013)(CUTPA provides remedy that

is separate and distinct from the remedies provided by contract).

The ELR is rooted in the observation that "the U.C.C. is generally regarded as the exclusive

source for ascertaining…liability…. and courts have been reluctant to extend judicial doctrines

that might dislocate the legislative structure." Reece v. Homette Corp., 110 N.C. App. 462, 466,

429 S.E.2d 768, 770 (1993). It would be ironic if the court were to use the ELR to "dislocate the

legislative structure" of the UDTPA in the present case. Finally, Section 17.3 of the MCSA

provides that "the duties, obligations, rights and remedies under this Agreement…are….in

addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or

available by law." Thus, to the extent IPI has a breach of contract claim against Hoku Materials

in the bankruptcy case, that claim is in addition to other remedies such as the UDTPA claim and,

as discussed below, a negligent misrepresentation claim.

Paul cites two cases, 2 Hounds Design and Broussard for the proposition that the ELR bars

a UDTPA claim. Those cases are distinguishable. 2 Hounds Design involved only a contractual

dispute involving a licensing agreement and "the crux of this dispute centers on whether the parties

have complied with the licensing agreement." 2 Hounds Design, 2014 WL 4407015, at *4.

Similarly, in Broussard, the dispute centered on "the administration of a common advertising trust

fund for the benefit of all Meineke dealers" and "the parties differ fundamentally on their rights

and obligations under the Franchise and Trademark Agreements that govern every aspect of their

relationship." Broussard, 155 F.3d at 345. In the present case, the claims center on

misrepresentations concerning Hoku Materials' financial status and the unfair acts of allowing IPI

to continue working and issuing the MCSA when Hoku Materials was grossly undercapitalized.

16

## F. IPI Has Sufficiently Pled Fraud.

Paul contends at pages 13-17 of his Memorandum that IPI has not sufficiently pled fraud, contending Paul actually intended to pay IPI.

IPI's fraud claim is based first on the "express and continuing" representations in the MCSA that Paul reviewed and approved, stating positively: "Owner [Hoku Materials] is financially solvent, able to pay its debts as they mature and has sufficient working capital to complete its obligations under this Agreement." (FAC ¶ 114.) The required scienter for fraud is not present without both knowledge of falsity (or reckless disregard for the truth of the representation) and an intent to deceive, manipulate, or defraud. Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 568-69, 374 S.E.2d 385, 391 (1988).

Hoku Corporation/Materials (on a consolidated basis) in fact had a huge working capital deficiency of negative $231 million at that time, a fact that could not be more opposite the representation that Hoku Materials "has sufficient working capital to complete its obligations under this Agreement." The representation was that Hoku Materials "has" sufficient working capital in the present, not that it will have it in the future.

An officer of a corporation may be held liable for misrepresenting the solvency of the corporation. In Anthony v. Jeffress, 172 N.C. 378, 90 S.E. 414, 415 (1916), the plaintiff sold a "bill of goods" to a corporation. The president represented that the corporation was solvent, when in fact its liabilities "largely" exceeded its assets and the company ended up in receivership. The plaintiff sued the president for willful misrepresentation as to the solvency of the company. The Anthony court ruled that an officer or director cannot plead ignorance concerning the financial condition of the company: "It is immaterial whether the defendants were cognizant of the insolvent condition of the company or not. The law charges them with actual knowledge of its financial

condition, and holds them responsible for damages sustained by stockholders and creditors by reason of their negligence, fraud, or deceit. [cits omitted]."  Id.

At the bottom of page 14 of his Memorandum, Paul makes reference to "funds with which to pay were committed" and cites ¶ 287 of the FAC.  That paragraph refers to a $100 million loan that was in the works in March 2012 (but never occurred).  IPI reiterates that it makes no claim for anything that happened after January 1, 2012.  If Paul could point to funds that were "committed" to Hoku Materials at the time of Zhang's execution of the MCSA on October 6, 2011, to adequately capitalize Hoku, that would significant.  But the allegations are that Tianwei was not committed to providing the financing at the time the MCSA was executed or at any time thereafter in 2011. (FAC ¶¶ 144, 178, 258.)

On page 15 of his Memorandum, Paul contends that IPI has to show "something more," such as an allegation that "his compensation was enhanced in any way by making the statements at issue."  IPI alleges that the success or failure or Hoku Corporation as a whole depended on completing the conduction of the plant as quickly as possible, so revenue could be generated from the sale of polysilicon.  (FAC ¶¶ 31, 60, 158).  Additionally, Paul knew he would lose his job and compensation if the plant did not get built.  (¶¶ 182 and 330).  To meet Paul's request that IPI allege his compensation was enhance by making the statements, IPI expounds on these earlier allegations in Count IV to As of October 6, 2011, Paul already owned tens of thousands shares of Hoku Corporation, had a base salary of $350,000, a long term incentive bonus of $200,000, a safety bonuses of $50,000, and a restricted stock grant valued at $210,000 that would vest only if Paul remained employed by Hoku Corporation as of March 31, 2012.  It appears likely that he had over $1 million riding on the prompt completion of the Plant.  That is a powerful incentive.

The purpose of the express representations in Section 3.9 of the MCSA was to deceive or manipulate IPI into believing Hoku Materials had adequate working capital and the ability to meet its payment obligations, when it in fact did not. The purpose of the misrepresentations in Paul's November 18 email was to deceive IPI into believing that funds were available to be transferred to the U.S. immediately to pay IPI in full, and that the only thing preventing that from happing was transfer restrictions by the Chinese government. By creating this fabrication, Paul intended to string out IPI and other contractors, keeping them working. IPI alleges that Paul knew all these representations were false or that he made them recklessly with a conscious disregard for the truth. Furthermore, as an officer and director, Paul cannot plead ignorance of Hoku's financial condition. IPI also alleges that Paul intended to deceive or manipulate IPI to induce IPI to execute the MCSA, and later, on November 18, 2011, to continue working. Thus, the two prongs required to show "scienter" are met. See Wright v. Bankamerica Corp., 219 F.3d 79 (2nd Cir. 2000).

## IV.   VENUE IS PROPER IN NORTH CAROLINA

28 U.S.C.A. § 1391(b) provides venue is proper in: (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Subsection (b)(1) is not applicable since the defendants live in different states. Under (b)(2), venue is proper in North Carolina due to all the events and activities that occurred in North Carolina giving rise to the claims as shown by the allegations and the affidavits of Ransom, Jones,

Roberts and Brakefield (IPI's management team) filed herewith. The injury to IPI occurred in North Carolina. All of Defendants' solicitations for IPI to perform work were received in North Carolina. All the contracts were reviewed and executed in North Carolina. All the misrepresentations in emails, telephone calls, and the MCSA were received in and relied on in North Carolina.

In May 2010 a project manager working under Paul as president and CEO first contacted IPI in North Carolina to ask that IPI perform work on the Plant. (See Roberts Decl.¶ 5, submitted for jurisdiction/venue purposes *only*.) This led to issuance of a purchase order signed by Paul and delivered by him to IPI in North Carolina. (FAC ¶ 90; see also, generally, Roberts Decl. submitted for jurisdiction/venue purposes *only*) Later, Hoku Materials' Director of Construction (Phillips), at the direction of Zhang, contacted IPI in North Carolina to ask what other work IPI could do, which led to the Tank Farm Contract. (FAC ¶¶ 96-97.) Then Zhang and his project managers asked IPI to submit a proposal for supplying steel, which led to the Steel Supply Agreement. (FAC ¶¶ 102-103.) Then Zhang and/or Phillips asked IPI in North Carolina to submit a proposal for various construction services, which led to the MCSA. (FAC ¶¶ 109-110.) IPI executed all the contracts in North Carolina and relied on Defendants' misrepresentations in North Carolina. (FAC ¶ 94.) As a result of all this, from April 2011 through December 2011, IPI invoiced for an excess of $30 million of work. Throughout this time, IPI (a) performed project management, engineering, and project support services from North Carolina, (b) shipped a substantial amount of company owned welding and fabrication equipment from its shop in North Carolina to Idaho, (c) purchased large quantities of piping and other materials in North Carolina and shipped them from North Carolina to Idaho, and (d) used funds from its bank account in North Carolina to pay the payroll of workers in Idaho and North Carolina. (See Brakefield Decl. ¶¶ 5-9, submitted for

jurisdiction/venue purposes only.) These activities continued during October, November, and December 2011 after the issuance of the MCSA with its misrepresentations. (FAC ¶¶ 304-306.)

Significantly, as a matter of law, the injury to IPI is deemed to be in North Carolina. CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1079 (9th Cir. 2011) ("We have repeatedly held that a corporation incurs economic loss, for jurisdictional purposes, in the forum of its principal place of business."); ITCO Corp. v. Michelin Tire Corp., Commercial Div., 722 F.2d 42, 49 (4th Cir. 1983) on reh'g, 742 F.2d 170 (4th Cir. 1984)("Manifestly, the injuries sustained" based on UDTPA claim by "a North Carolina corporation with its principal place of business in North Carolina, were sustained in the state of North Carolina."). Jordan v. Shaw Indus., Inc., 131 F.3d 134 (4th Cir. 1997)("When a person sustains loss by fraud, the place of the wrong is where the loss is sustained, not where fraudulent representations are made.").

Venue is also proper in North Carolina under (b)(3) because North Carolina has personal jurisdiction and Idaho does not (or at least the Defendants have made no showing that it does; see Paul Memo p. 23), meaning this action could not have been brought in Idaho.

Zhang and Liu contend that are "numerous forum selection clauses" in the Tank Farm Contract and MCSA. P. 3 and 21. Paul contends that "in its contracts with Hoku Materials, IPI chose Idaho as the exclusive forum for resolving any disputes, and it chose Idaho law to apply to such disputes." Paul acknowledges that he "was not a party to those contracts" but asks the court to consider the forum selection and choice of law provisions anyways. P. 23. However, Defendants mischaracterize the so-called forum selection clauses. Section 15.4 of the Tank Farm Contract and the MCSA requires that Claims between IPI and Hoku Materials be resolved through arbitration. As Paul points out, the Defendants were not parties to that agreement. In any event, nowhere does the contract even say the arbitration has to be in Idaho. In fact, Section 15.4.3 states

that any arbitration award "may be entered ….in any court having jurisdiction thereof" and that the arbitration agreement may be enforced "under applicable law in any court having jurisdiction thereof" (not just Idaho).

There is a very limited provision in Section 15.4 that provides the if, in an arbitration between IPI and Hoku Materials, "if either party may be prejudiced as set forth above by the inability of party to join [to the arbitration] another party that would be subject to the jurisdiction of the state or federal courts of the State of Idaho, such party may (but is not obligated to) move the arbitrator(s) [to] dismiss the arbitration and direct the parties to litigate such matters in any court of competent jurisdiction located in Idaho and each party hereby irrevocably and unconditionally submits to such exclusive jurisdiction and venue." This is what Zhang and Liu misleadingly refer to as "numerous forum selection clauses." By selectively quoting just a few of these words at p. 3 of their Memorandum, Zhang and Liu mischaracterize this provision. The quoted provision obviously has no application here since there is no arbitration and no inability to add to an arbitration a party subject to the jurisdiction of the courts in Idaho.

The Fourth Circuit has explained claims that that UDTPA claim arising ex delicto, not ex contractu, and that the UDTPA would apply "without regard to the presence of the contractual choice of law provision. The nature of the liability allegedly to be imposed by the statute is ex delicto, not ex contractu. No issue of contractual construction, interpretation, or enforceability is raised by this case. The liability alleged is predicated, rather, upon actions separate and distinct from the Dealer Sales Agreement itself." ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 49 n. 11 (4th Cir. 1983). All claims asserted by IPI are ex delicto, and so they should not be governed by the contract choice of law provision or the contract forum selection clause (assuming there is one that somehow applies).

Defendants contend that venue is improper in North Carolina and that this case should be transferred to Idaho under §1406(a). Section 1406(a) allows transfer where venue is improper or where there is no personal jurisdiction in North Carolina. Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962) (holding transferor court need not have personal jurisdiction to transfer a case pursuant to § 1406).

Section 1406(b) requires a showing that Idaho is a district where the action might have been brought. To meet that requirement, "the transferee court must be a proper venue and must have personal jurisdiction over the defendant. Indeed, these two characteristics must be independently true, without considering waiver of either venue or personal jurisdiction by the defendant." Forums to which Transfer Possible, 15 Fed. Prac. & Proc. Juris. § 3845 (4th ed.). Until Defendants demonstrate to this court that Idaho would have personal jurisdiction, there is no basis for this court to transfer this case to Idaho under either §1404(a) or §1406(a). Defendants have previously argued in the fraud/RICO case brought by another contractor (JH Kelly) in Idaho in 2013 that Idaho **did not** have personal jurisdiction. Paul makes reference to this suit at pp. 18-19. Though the case has similarities to the present case, the allegations and claims in the present case are materially different. Nevertheless, the argument Zhang and Liu made in their Motion to Dismiss in that case is relevant to the present case. A copy of their "Memorandum in Support of Motion to Dismiss or Stay" filed in that case is included as an exhibit in the Weber Declaration, which is submitted for jurisdiction/venue purposes *only*. See cases cited by Defendants to support an earlier position that Idaho did not have jurisdiction to hear the JH Kelly case CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1079 (9th Cir. 2011); Zero Motorcycles, Inc. v. Pirelli Tyre S.p.A., 517 F. App'x 589, 590 (9th Cir. 2013). These authorities not only support finding in

23

the present case that North Carolina has personal jurisdiction whereas Idaho does not under its long arm statute.

## V.     TRANSFER OF VENUE FOR CONVENIENCE OF PARTIES AND WITNESSES

Defendants argue alternatively that, even if venue is proper in North Carolina, the case should be transferred under Section 1404(a) for the convenience of the parties and the witnesses. In fact Idaho would not be more convenient for a number of reasons.

First, none of the parties is in Idaho.  Paul, Liu, and Zhang live in Hawaii, California, and New Jersey, respectively.  IPI is in North Carolina and its management team (Jones, Ransom, Brakefield, and Roberts) reside in North Carolina or next door South Carolina (IPI's office is a few miles from the state line). As for witnesses, there simply are very few, if any, in Idaho that would have any knowledge relevant to this case.  Defendants have not pointed to a single witness in Idaho.  Witnesses with knowledge would be in North Carolina, Hawaii (where Hoku Corporations' main office was located and where its bank, accountant, and documentation would be located), or New York (where all the lenders to Hoku are located), or China (where Tianwei is located).  Additionally, this case would be assigned to the Pocatello division or the District of Idaho.  Although Pocatello is the largest town in sparsely populated eastern Idaho, it has only 54,000 residents and is fairly remote.  It has a small regional airport, and the best way to get there is to fly to Salt Lake City and drive 2-3 hours to Pocatello. (See, generally, Jones Decl., submitted for jurisdiction/venue purposes only.)

Defendants try to make it sound like there is much activity in the bankruptcy case in Idaho. Currently, the only activity is in the state court where the court is assigned the limited task of determining the priority to the $7 million in net proceeds available to satisfy numerous secured creditors.  The only issue pending in state court is the determination of priorities of secured claims.

24

IPI submits the most recent order from the state court directing the parties to mediation to resolve how the $7 million in net proceeds should be divvied up. (<u>See</u> Weber Decl, Exhibit B, submitted for jurisdiction/venue purposes *only*.)

Finally, IPI's choice of North Carolina as the forum should be given great weight. However, Should the court find that North Carolina does not have personal jurisdiction with regard to all three individual defendants, then IPI requests that the court transfer the entire case to Idaho under §1406(a) and <u>Goldlawr, Inc. v. Heiman</u>, supra. Defendants should be deemed to have consented to jurisdiction in Idaho based on their request that this case be transferred there. Note that their consent to jurisdiction does not mean the case could have been "brought" by IPI in Idaho under §§ 1391, 1404, and 1406. If the court were to find personal jurisdiction in North Carolina with regard to at least one of the three individual defendants, then IPI requests that the court dismiss the case without prejudice with regard to the defendant(s) as to whom there is no jurisdiction, and allow the case to proceed in North Carolina as to the defendant(s) as to whom there is jurisdiction.

## VI.   <u>CONCLUSION</u>

For these reasons, Plaintiff respectfully asks that this Court deny Defendant Scott Paul's Motion to Dismiss First Amended Complaint or, in the alternative, to Transfer Venue.

Respectfully submitted this the 23rd day of February, 2015.

/s/ Elizabeth A. Martineau
Elizabeth A. Martineau
NC Bar # 26394
Martineau King PLLC
PO Box 31188
Charlotte, NC  28231
Telephone: (704) 247-8520
Fax: (704) 943-0543
Email: emartineau@martineauking.com
*Attorney for the Plaintiff*

/s/ Daniel J. Weber
Daniel J. Weber
Georgia Bar No. 744869
DelCampo Weber & Grayson LLC
5455 Chamblee Dunwoody
Atlanta, Georgia 30338
Telephone: (404) 808-6670
Email: Dan@dwglawfirm.com
*Attorney for the Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing **RESPONSE IN OPPOSITION TO PAUL'S**

**MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION TO TRANSFER VENUE**

was served upon all counsel of record by depositing a copy of the same in an official depository

of the United States mail in a postage-paid envelope, or pursuant to the ECF service if appropriate,

addressed as follows:

Jack S. Gjording
James B. Smith
Gjording Fouser PLLC
121 N. 9th Street
P.O. Box 2837
Boise, ID 83702
jgjording@gfidaholaw.com
jsmith@gfidaholaw.com
*Attorneys for Tao Zhang and Dayi Liu*

Howard Holderness
Morgan Lewis & Bockius, LLP
One Market, Spear Street Tower
San Francisco, Ca 94105
hholderness@morganlewis.com

Celeste K. Miller
McDevitt & Miller LLP
420 West Bannock St.
P.O. Box 2564
Boise, Idaho 83701
ck@mcdevitt-miller.com

John William Ormand, III
Brooks, Pierce, McLendon, Humphrey &
Leonard, LLP
P.O. Box 1800
Raleigh, NC 27602
jormand@brookpierce.com

*Attorneys for Scott Paul*

This the 23rd day of February, 2015.

/s/ Elizabeth A. Martineau
Elizabeth A. Martineau
NC Bar # 26394
Martineau King PLLC
PO Box 31188
Charlotte, NC 28231
Telephone: (704) 247-8520
Fax: (704) 943-0543
Email: emartineau@martineauking.com
*Attorney for the Plaintiff*