IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14-CV-537-RJC-DCK

INDUSTRIAL PIPING, INC.,
      Plaintiff,

v.

TAO (MIKE) ZHANG, DAYI (SEAN)
LIU, SCOTT PAUL, TIANWEI NEW
ENERGY HOLDINGS CO., LTD. and
DOES 1-10,

      Defendants.

**PLAINTIFF'S RESPONSE IN
OPPOSITION TO ZHANG AND
LIU'S MOTION TO DISMISS OR IN
THE ALTERNATIVE MOTION TO
TRANSFER VENUE**

NOW COMES PLAINTIFF**,** Industrial Piping, Inc., by and through its undersigned

attorneys, to submit this Response in opposition to Defendants Zhang and Liu's Motion to Dismiss

First Amended Complaint or, in the alternative, to Transfer Venue.

## ADDITIONAL PLED FACTS ZHANG AND LIU FAILED TO BRING TO THE COURT'S ATTENTION

Defendant Zhang was the president of Hoku Materials and a director for Hoku Corporation.

He was concurrently a vice general manager for Tianwei.  He was required by a corporate

resolution to report to Xia (vice general manager for Tianwei and chair of the Hoku Corporation

board in China) and Paul (CEO of Hoku Corporation and Hoku Materials) as members of the Hoku

Materials Executive Committee, and take direction from them.  He or his project management

team solicited IPI's Ransom in North Carolina to submit proposals for the Tank Farm Contract,

the Steel Supply Agreement, and the MCSA.  (Ransom Decl. ¶¶ 96-98, 102, 109, submitted for

jurisdiction/venue purposes *only*.)  He signed all three contracts.  By signing the MCSA, he

adopted and verified the "express and continuing representations" in Section 3.9 as well as the

implied representation in Section 6.2.6. (First Amended Compl. "FAC" ¶¶ 13, 96-106, 109-110, 112, 118-119, 124 -140.)

Section 3.9 of the MCSA set forth "express and continuing representations and warranties," including that "3.9.7 Owner is financially solvent, able to pay its debts as they mature **and has sufficient working capital to complete its obligations under this Agreement."** The representations was made "continuing" so that IPI could know from day to day, that Hoku Materials was maintaining a positive working capital to meet its obligations. Defendants should have maintained a positive working capital so it would have, at all times, sufficient Current Assets to pay Current Liabilities. Section 6.2.6 of the MCSA required Hoku Materials to make payment within thirty (30) days from the receipt of an invoice. This promise to make payments necessarily included an implied representation that Hoku Materials had the financial resources to pay invoices in a timely manner. (FAC ¶¶ 114, 119, 190-207, 208-210, 232 -233, 325.)

Zhang adopted and verified this implied representation when he signed the MCSA and IPI's Ransom relied these misrepresentations from the MCSA in North Carolina. (FAC ¶¶ 119, 183, 208-210, 337, 358, 360.)

Zhang received Ransom's email inquiries from October 11 to November 16, 2011 and remained silent despite a duty to speak. He knew in October that Hoku Materials would not be able to continue paying IPI's invoices. Given the continuing nature of the § 3.9 representations, Zhang had a duty to speak and disavow the § 3.9 representations at any point in time when he knew they were false. Zhang remained silent with the intent of inducing IPI to continue working. Zhang also sent to Ransom in North Carolina the email on November 18, 2011 in which he quoted the false statements made by Paul, and subsequently made additional misrepresentations by

telephone to Ransom and Jones in North Carolina on December 8 and 16, 2011. (FAC ¶¶ 234, 237-243, 249.)

Due to his participation in all the foregoing misrepresentations that form the basis of Counts I, II, and III, Zhang is personally liable for those torts. Zhang also participated in the unfair acts alleged in Count IV in that he, Paul, and Liu jointly decided to allow IPI to continue working and to issue the MCSA despite Hoku Materials' gross undercapitalization and inability to meet its obligations. Zhang was also fully aware, as shown in the minutes of the 23 Executive Team meetings, that Hoku Materials did not have the resources to be financially independent and by September 2011, Tianwei clearly was not committed to providing the necessary resources. (FAC ¶¶ 172-180.)

Zhang had strong reasons to conceal Hoku Materials' financial condition and to induce IPI to execute the MCSA and induce IPI to continue working on the project with Paul's November 18, 2011 email. Zhang, Liu, and Paul had a pecuniary interest in IPI continuing to work on the project as their compensation and continued employment depended on the success of the project. (FAC ¶ 182) In FAC ¶ 369 of Count IV IPI expounds on the allegation in ¶ 182. As of October 6, 2011, Zhang already owned thousands shares of Hoku Corporation. For FY 2012 (ending March 31, 2012), Zhang had a base salary of $175,000 per year, a long term incentive bonus of $100,000, a safety bonus of $25,000, and restricted stock grants valued at $110,000, which would vest only if Zhang remained employed by Hoku Corporation as of March 31, 2012. Altogether Zhang had hundreds of thousands of dollars riding on the successful completion of the plant as soon as possible. (FAC ¶¶ 14, 182, 330.)

Defendant Liu was accounting manager for Tianwei and Vice President of Finance for Hoku Corporation, and was responsible for managing the finances of the subsidiaries, including

budgets and cash flow projections for Hoku Materials. As shown by the "Action Item" in the minutes of the Executive Team meetings, Liu was integral to determining what resources Hoku needed to achieve financial independence and for communicating with Tianwei to make sure those resources were provided. He knew that Hoku Materials was grossly undercapitalized as of September 30, 2011 and that Tianwei was not committed to providing the needed resources. Liu was aware that Zhang planned to issue the MCSA and approved doing so, even though he knew it contained a representation that Hoku Materials would pay invoices in a timely manner, knowing it did not have the ability to do so. He intended and expected that the MCSA would be sent to IPI in North Carolina, and that IPI would rely on the promise to pay invoices in a timely manner. (*See also,* Ransom Dec. submitted for jurisdiction/venue purposes *only).* He received Ransom's email inquiries from October 11 to November 16, 2011 and remained silent despite a duty to speak under the circumstances. Leading up to November 18, 2011, when Paul communicated to jobsite personnel the false statements quoted by Zhang in his email of that date, Liu discussed strategy with Paul and Liu or provided information to help formulate the statements. He should have reasonably expected that the information provided by Paul would be sent to IPI in North Carolina and relied on by IPI. Due to his participation in all the foregoing misrepresentations that form the basis of Counts I, II, and III, Liu is personally liable for those torts. Liu also participated in the unfair acts alleged in Count IV in that he, Paul, and Zhang jointly decided to allow IPI to continue working and to issue the MCSA despite Hoku Materials' gross undercapitalization and inability to meet its obligations. (FAC ¶¶ 15, 117, 173-182, 188, 199, 211, 213, 215, 220, 238, 243-245.)

As a result of Zhang's and Paul's misrepresentations and unfair acts, IPI continued during October, November, and December 2011, after the execution of the MCSA to (a) perform project management, engineering, and project support services from North Carolina, (b) shipped a

substantial amount of company owned welding and fabrication equipment from its shop in North Carolina to Idaho, (c) purchased large quantities of piping and other materials in North Carolina and shipped them from North Carolina to Idaho, and (d) used funds from its bank account in North Carolina to pay the payroll of workers in Idaho and North Carolina. These activities cost IPI millions of dollars. (IPI does not claim any damages after January 1, 2012 for the crew it kept on site because in late January 2012, IPI started to learn that Hoku Materials in fact did not have funds in account that were being held up.) (FAC ¶¶ 92, 308-316.)

## THIS COURT CLEARLY HAS PERSONAL JURISDICTION OVER ZHANG AND LIU

The dual jurisdictional requirements of long arm statute and due process collapse into a single inquiry in North Carolina. _Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan_, 259 F.3d 209, 215 (4th Cir. 2001). See _Pittsburgh Terminal Corp. v. Mid Allegheny Corp._, 831 F.2d 522, 525-26 (4th Cir. 1987). (See Brakefield Decl. submitted for jurisdiction/venue purposes _only).

Thus, courts have consistently found personal jurisdiction where a defendant "purposefully directed" tortious conduct (including misrepresentations) toward the resident of another state and that resident suffers harm in that state. See _ePlus Tech., Inc. v. Aboud_, 313 F.3d 166, 177 (4th Cir. 2002); _Vishay Intertechnology, Inc. v. Delta Int'l Corp._, 696 F.2d 1062, 1068-69 (4th Cir. 1982)(North Carolina had personal jurisdiction over California resident on UDTPA where nonresident's tortious conduct was directed at plaintiff in North Carolina even though nonresident's only contacts with North Carolina were three letters and five telephone calls); _Blue Mako, Inc. v. Minidis_, 472 F. Supp. 2d 690, 701 (M.D.N.C. 2007)(where an nonresident corporate officer negotiated contract prior to signing, and sent false and misleading or inaccurate information to North Carolina to induce plaintiff to sign the contract, the court concluded it "clearly has

jurisdiction" over the officer); Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp., 640 F.

Supp. 1411, 1427 (E.D.N.C. 1986)(legislative history of UDTPA shows that General Assembly

intended that nonresident defendants would be liable for injuries caused in North Carolina). Even

if this case were in Idaho, that district court should find that North Carolina has personal

jurisdiction. Zero Motorcycles, Inc. v. Pirelli Tyre S.p.A., 517 F. App'x 589, 590 (9th Cir.

2013)(nonresident was subject to jurisdiction in California because he should have reasonably

expected that harm from his tortious conduct would occur in California where the plaintiff's

principal place of business was located).

All three reasons are present why North Carolina should be able to assert jurisdiction are

present here. First, North Carolina has a manifest interest in providing a forum for its resident,

IPI, to redress injuries inflicted by Defendants. Also, North Carolina has an interest because it is

North Carolina law that governs the conduct here since the injury to IPI occurred in North Carolina.

Second, the Defendants derived benefits from their misrepresentations and unfair acts directed at

this state, in that IPI was induced to continue working in October, November, and December 2011.

Finally, modern transportation and communications make is much less onerous for Defendants (in

Hawaii, New Jersey, and California) to defend themselves in North Carolina as compared to a

remote location such as Pocatello in sparsely populated eastern Idaho.

IPI has adequately alleged that Zhang purposefully directed his activities to North Carolina

because he (a) knew IPI was located in North Carolina, (b) intended the misrepresentations in the

MCSA to be relied on in North Carolina to induce IPI to execute the MCSA, (c) his silence in

response to Ransom's inquiries from October 11 to November 16, 2011 despite a duty to speak

was intended to induce IPI to continue working, (d) forwarded Paul's false statements in the

November 18, 2011 email so IPI would rely on them in North Carolina and continue working, (e)

misrepresented affirmatively to IPI on December 5, 8, and 16 that funds were available and the only reason for nonpayment was a "transfer limit issue," and that funds would be available by the Chinese New Year (January 23, 2012), and (f) knew that any harm to IPI would be in North Carolina at its principal place of business. With regard to Count IV, Zhang's joint decisions with Paul and Liu to not curtail construction and to issue the MCSA to IPI in North Carolina despite Hoku Materials being grossly undercapitalized, were directed at IPI in North Carolina so that IPI would continue working.

Additionally, IPI has adequately alleged that Liu purposefully directed his activities to North Carolina because he (a) knew IPI was located in North Carolina, (b) provided to the Zhang the information as reflected in the express representations in Section 3.9 of the MCSA, (c) approved the issuance of the MCSA with the intent that the implied misrepresentation in § 6.2.6 in the MCSA to be relied on in North Carolina to induce IPI to execute the MCSA, (d) remained silent in response to Ransom's inquiries from October 11 to November 16, 2011 despite a duty to speak and intended by remaining silent to induce IPI to continue working, (e) reasonably expected Paul's false statements in the November 18, 2011 email to be sent IPI so it would rely on them in North Carolina and continue working, (f) knew that any harm to IPI would be in North Carolina at its principal place of business. With regard to Count IV, Zhang's joint decisions with Paul and Liu to not curtail construction and to issue the MCSA to IPI in North Carolina despite Hoku Materials being grossly undercapitalized, were directed at IPI in North Carolina so that IPI would continue working. Columbia Briargate Co. v. First Nat. Bank in Dallas, 713 F.2d 1052 (4th Cir. 1983) cited by Zhang and Liu at p. 6, does not support his position, because it held that the fiduciary shield doctrine does not apply where the "the long-arm statute of the forum state is co-extensive with the full reach of due process" (as is the case in North Carolina) and the court found there was

personal jurisdiction. Id. at 1064. In Smith v. Duffey, cited by Zhang and Liu at p. 6, a Memorandum and Recommendation by a magistrate judge that is not reported on Weslaw. There the magistrate judge found that a claim for fraud was not stated. There was no discussion of whether there was any tortious conduct by the defendant purposefully directed at the plaintiff in North Carolina. Zhang and Liu also ignore that the judge did allow the case to go forward on the UDTPA claim even though there was no duty to speak. This case actually is on point with and supports the proposed Count IV.

## <u>VENUE IS PROPER IN NORTH CAROLINA</u>

IPI responds here to Zhang and Liu's contention at pages 9-10 that venue is not proper in North Carolina. 28 U.S.C.A. § 1391(b) provides venue is proper in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action. Subsection (b)(1) is not applicable since the defendants live in different states. Under (b)(2), venue is proper in North Carolina due to all the events and activities that occurred in North Carolina giving rise to the claims as shown by the allegations and the affidavits of Ransom, Jones, Roberts and Brakefield (IPI's management team) filed herewith.

The injury to IPI occurred in North Carolina. All of Defendants' solicitations for IPI to perform work were received in North Carolina. All the contracts were reviewed and executed in North Carolina. All the misrepresentations in emails, telephone calls, and the MCSA were

received in and relied on in North Carolina. (See Ransom Decl. submitted for jurisdiction/venue purposes *only).*

In May 2010 a project manager working under Paul as president and CEO first contacted IPI in North Carolina to ask that IPI perform work on the Plant. This led to issuance of a purchase order signed by Paul and delivered by him to IPI in North Carolina. Later, Zhang (as president) and his Director of Construction (Phillips) contacted IPI in North Carolina to ask what other work IPI could do, which led to the Tank Farm Contract. Then Zhang and his project managers asked IPI to submit a proposal for supplying steel, which led to the Steel Supply Agreement. Then Zhang and/or Phillips asked IPI to submit a proposal for various construction services, which led to the MCSA. IPI executed all the contracts in North Carolina and relied on Defendants' misrepresentations in North Carolina. (See Roberts, Ransom Decl. submitted for jurisdiction/venue purposes *only).*

As a result of all this, from April 2011 through December 2011, IPI invoiced for in excess of $30 million of work. Throughout this time, IPI (a) performed project management, engineering, and project support services from North Carolina, (b) shipped a substantial amount of company owned welding and fabrication equipment from its shop in North Carolina to Idaho, (c) purchased large quantities of piping and other materials in North Carolina and shipped them from North Carolina to Idaho, and (d) used funds from its bank account in North Carolina to pay the payroll of workers in Idaho and North Carolina. These activities continued during October, November, and December 2011 after the issuance of the MCSA with its misrepresentations. Finally and significantly, as a matter of law, the injury to IPI is deemed to be in North Carolina. CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1079 (9th Cir. 2011) ("We have repeatedly held that a corporation incurs economic loss, for jurisdictional purposes, in the forum

of its principal place of business."); ITCO Corp. v. Michelin Tire Corp., Commercial Div., 722 F.2d 42, 49 (4th Cir. 1983) on reh'g, 742 F.2d 170 (4th Cir. 1984)("Manifestly, the injuries sustained" based on UDTPA claim by "a North Carolina corporation with its principal place of business in North Carolina, were sustained in the state of North Carolina."). Jordan v. Shaw Indus., Inc., 131 F.3d 134 (4th Cir. 1997)("When a person sustains loss by fraud, the place of the wrong is where the loss is sustained, not where fraudulent representations are made."). (See Brakefield and Ransom Decl. submitted for jurisdiction/venue purposes *only).*

Venue is also proper in North Carolina under (b)(3) because North Carolina has personal jurisdiction and Idaho does not (or at least the Defendants have made no showing that it does; see Paul Memo p. 23), meaning this action could not have been brought in Idaho.

## IPI HAS STATED POPPER CLAIMS AGAINST ZHANG AND LIU AND THEIR MOITION TO DISMISS FOR FAILURE TO STATE A CLAIM SHOULD BE DENIED

A. IPI Sufficiently Pled Falsity of the Representations in the MCSA.

Zhang and Liu wrongly contend that IPI has not sufficiently plead falsity of the misrepresentations. Hoku Corporation/Materials (on a consolidated basis) in fact had a huge working capital deficiency of negative $231 million at that time, a fact that could not be more opposite the representation that Hoku Materials "has sufficient working capital to complete its obligations under this Agreement." The representation was that Hoku Materials "<u>has</u>" sufficient working capital in the present, not that it will have it in the future.

An officer of a corporation may be held liable for misrepresenting the solvency of the corporation. In Anthony v. Jeffress, 172 N.C. 378, 90 S.E. 414, 415 (1916), the plaintiff sold a "bill of goods" to a corporation. The president represented that the corporation was solvent, when in fact its liabilities "largely" exceeded its assets and the company ended up in receivership. The

Anthony court ruled that an officer or director cannot plead ignorance concerning the financial condition of the company. Id.

B. IPI Makes No Claim for Damages *AFTER* January 1, 2012.

Zhang and Liu contend that in February 2012, "when IPI became aware that Hoku did not already have the money and was relying on borrowing new money, IPI kept working, just as it had done before." (memo. p. 13)[1]. However, IPI makes clear in multiple allegations that it is claiming damages only for October, November, and December (see 282, 303-306, 338 and 361. IPI states expressly it is not claiming damages for the small crew that stayed on site after December 31, 2011. (295). IPI does not claim the cost of the small crew because in beginning in January/February the Defendants, for the first time, began to explain that Hoku Materials actually did not have funds but that a loan was in the works, but never happened.

C. The Economic Loss Rule (ELE) Does Not Bar Negligent Misrepresentation.

Section 552 expressly gives a remedy only for "pecuniary loss," which is the same as "economic loss" (monetary loss). Comment (a) to §552 explains that liability under §552 does not extend to "negligent misrepresentation that results in physical harm." Moreover, the Supreme Court was fully aware of the ELR when it adopted § 552. Defendants had a strong pecuniary interest in inducing IPI to execute the MCSA and continuing work. Thus, § 552, gave rise to a duty independent duty for them to "exercise reasonable care or competence in obtaining or communicating the information" concerning financial condition of Hoku Materials to IPI.

---

[1] Zhang and Liu cite Angell v. Kelly, 2006 WL 3479010, *8 (M.D.N.C. 2006) at the bottom of page 13 of their Memorandum. IPI will address Angel in the discussion of *Reliance*.

Nowhere does the MCSA state or require the Defendants to exercise reasonable care in obtaining or communicating financial information to IPI. Rather, that duty arises independently under § 552.

Additionally, North Carolina courts recognize an independent duty under § 552 on the part of officers of a company and others to provide "accurate, or at least negligence free, financial information" in connection with transactions. <u>Kindred of N. Carolina, Inc. v. Bond</u>, 160 N.C. App. 90, 584 S.E.2d 846, 852-53 (2003); <u>Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc.</u>, No. 109CV00018, 2010 WL 3943754, at *2 (M.D.N.C. Oct. 7, 2010); <u>Raritan River Steel Co. v. Cherry, Bekaert & Holland,</u> 322 N.C. 200, 203, 367 S.E.2d 609, 611 (1988) (accountants liable to plaintiff who sold steel to and extended credit to manufacturer "overstatement of net worth" in an audit report. §552 imposed "upon defendants a duty of care." Availability of breach of contract claim against the manufacturer did not bar the negligent misrepresentation claim). See also, an analogous case where liability arose when defendant misrepresented whether it had the ability to perform under contract. <u>Ada Liss Grp. v. Sara Lee Corp.</u>, No. 06CV610, 2010 WL 3910433, at *1 (M.D.N.C. Apr. 27, 2010), (breach of contract, negligent misrepresentation, fraud, and UDTPA claim where defendant "made material misrepresentations either without any intent of carrying out its obligation to mark Products, or with reckless disregard as to whether marking would be done, whether it could be done, and whether it would be effective." Allegations set forth an adequate basis to find a separate and independent duty owed by the defendant outside the contractual relationship.).

In the present case, IPI alleges that Zhang and Liu participated in the misrepresentations with reckless indifference as to their truthfulness. (FAC ¶¶ 14, 18, 350-351.) Thus, the claim for negligent misrepresentation should survive the Motion to Dismiss under the decision in <u>Johnson Products</u>.

D. <u>Zhang and Liu are Personally Liable for the Negligent Misrepresentation</u>.

It is well established in North Carolina that an officer or director of a corporation is personally liable for torts he commits or in which he participates. <u>Minnis v. Sharpe</u>, 198 N.C. 364, 151 S.E. 735, 737 (1930). The court explained that an officer is personally liable if he "contributed to, or helped to bring about, the injury; that is to say, he must be a participant in the wrongful act. Some knowledge and participation, actual or implied, must be brought home to him." <u>Id</u>. North Carolina courts have adopted and applied this rule. See e.g., <u>Wilson v. McLeod</u> Oil Co., 327 N.C. 491, 518, 398 S.E.2d 586, 600 (1990); <u>Palomino Mills v. Davidson Mills Corp</u>., 230 N.C. 286, 292, 52 S.E.2d 915, 919 (1949); <u>Oberlin Capital, L.P. v. Slavin</u>, 147 N.C. App. 52, 57, 554 S.E.2d 840, 845 (2001)(director held responsible for negligent misrepresentation).

The Fourth Circuit adopted § 531 of the Restatement (Second) of Torts (1977) even though the Maryland Supreme Court had not done so. <u>Sempione v. Provident Bank of Maryland</u>, 75 F.3d 951, 962-63 (4th Cir. 1996). Section 531 provides for liability where one who makes a misrepresentation to a known person "if he knows that the misrepresentation is likely to reach that person" and that person is likely to rely on it. <u>Id</u>. at Comment f. Zhang and Liu's conduct clearly meets the § 531 requirements since, as explained previously, it is alleged that they knew IPI was in North Carolina and intended that misrepresentations in the MCSA, their silence in response to Ransom's inquiries despite a duty to speak, Paul's false statements in his November 18, 2011 email, and Zhang's misrepresentations on December 5, 8 and 16 reach IPI in North Carolina to for the purpose of inducing IPI to execute the MCSA and continue working.

E. <u>The Question of Justifiable Reliance is for the Jury</u>.

There are several reasons this court should <u>not</u> find as a matter of law that IPI could not have justifiably relied on Zhang and Liu's misrepresentations. The question of reliance "is one for the jury, unless the facts are so clear as to permit only one conclusion." <u>Forbis v. Neal</u>, 361 N.C. 519, 526-27, 649 S.E.2d 382, 387 (2007). "It is only in exceptional cases that the issue of reasonable reliance" may not be submitted to the jury. <u>Camacho v. Flowers</u>, 723 S.E.2d 173 (N.C. Ct. App. 2012). This is not an "exceptional case" where "the facts are so clear as to permit only one conclusion." Additionally, IPI had no idea as to how Hoku Materials was or was not capitalized. It had no knowledge that Tianwei, acting through Paul, Liu, and Zhang were arranging a series of just-in-time loans to pay only immediate operational and construction costs, without allowing Hoku Materials achieve a positive working capital balance. IPI had no access to the Executive Team 23 meetings that Paul, Zhang, and Liu were continuously discussing from May 2011 to January 2012 the fact that Hoku Materials did not have the resources to achieve "financial independence," meaning they did not sufficient current assets to pay current liabilities (i.e., positive working capital) to pay contractors if Tianwei were to pull the plug on the just-in-time loans.

Additionally, IPI did not have any reason for concern because the strategy of relying on just-in-time loans allowed Defendants to make payments up to September 2011 on a timely basis, thereby masking the underlying structural problem of a huge working capital deficiency that developed by September 2011. The working capital deficiency balloon finally burst in October after the pressure grew too large, and Tianwei put on hold further just-in-time loans. The wording in the Section 3.9 representations encouraged IPI not to make any further inquiry. Section 3.9 provided "express" and continuing "representations and warranties." Hoku Materials drafted the contract, and included the term "express" ("clearly and unmistakably communicated; stated with

directness and clarity." Black's Law Dictionary (10th ed. 2014)) to encourage IPI to not question the "representations and warranties." Also by including the term "representations" in addition to "warranties," Hoku Materials conveyed that IPI should rely on the express representation in executing the contract. "Representation" means "a presentation of fact — either by words or by conduct — made to induce someone to act, esp. to enter into a contract." Black's Law Dictionary (10th ed. 2014). Warranty, on the other hand, means "an express or implied promise that something in furtherance of the contract is guaranteed by one of the contracting parties…in general a warranty differs from a representation in four principal ways…(3) a warranty is an essential part of a contract, while a representation is usu. only a collateral inducement. Black's Law Dictionary (10th ed. 2014).

Hoku Materials was not a public company. Even if Ransom had checked the SEC filings (and knew how to do so) before executing the MCSA on September 28, 2011, <u>the September 30, 2011 Quarterly Report was not filed until almost two months later on November 25, 2011</u>. IPI subsequently demobilized by the end of December, except for one small crew. Only the Defendants could speak to Hoku Materials' current financial condition as of the end of September 30, 2011 from their superior knowledge, and they had already done that in the Section 3.9 by making "express and continuing" representations. Finally, even if the September 30, 2011 report (filed November 25, 2011) were available at the time of execution of the MCSA, it would have represented that Tianwei "has committed to provide the Company financial support for its ongoing operations, planned capital expenditures and debt service requirements until at least April 1, 2012." As of September 30, 2011 this was clearly false given that Tianwei was not committed to providing the needed capital. The September 30 quarterly report also stated: "If the Company is unable to

generate revenue, secure additional financing or structure credit terms with its vendors, the Company will be forced to curtail construction of the Polysilicon Plant."

Zhang and Liu cite Angell for the proposition that IPI had an obligation to conduct a search for SEC filings. Zhang and Liu mischaracterizes Angell. In that case, prior to closing on a merger the defendant gave plaintiff certain SEC filings and warranted in the contract: "Section 6.4: [Defendant] IHS 'has furnished [Plaintiffs] ... with a correct and complete copy' of all SEC documents from a certain date." Despite knowing that they did not have all the SEC documents, plaintiffs proceeded with the closing: "Plaintiffs closed knowing they had not received all SEC documents, documents that revealed Defendants' possibly conflicting obligations with Citibank and IHS's concern over the BBA. Plaintiffs chose to do no investigation on their own and did not inquire any further about where the SEC documents, which Defendants were to provide…" Id. at *10.

Angell actually supports that IPI's reliance was reasonable in citing and discussing a number of cases that have held that either "a plaintiff can rely on a defendant's representation when the defendant has superior access" or "a defendant can be liable for a fraudulent statement's harm, even when a plaintiff could determine the falsity on his own, if he induces the plaintiff to forgo independent investigation….A mere representation by itself can be "reasonably calculated" to induce forbearance." Id. at *6.

"Many decisions strongly support the view that accepting and relying on a definite and positive representation, without attempting to verify it, is reasonable unless the recipient has reason to doubt its accuracy." Robert G. Byrd, Misrepresentation in North Carolina, 70 N.C. L. Rev. 323, 333-34 (1992). The North Carolina Supreme Court has set forth the rationale:

> [T]he law does not require a prudent man to deal with everyone as a
> rascal and demand covenants to guard against the falsehood of every

representation which may be made as to facts which constitute material inducements to a contract. There *334 must be a reasonable reliance upon the integrity of men or the transactions of business, trade and commerce could not [prosper]

Here, § 3.9 made "express" ("clearly and unmistakably communicated; stated with directness and clarity") representations that were "positive and definite" in stating that "Owner is financially solvent, able to pay its debts as they mature and has sufficient working capital to complete its obligations under this Agreement."  These representations were "reasonably calculated to induce forbearance" as contemplated by the rule stated in <u>Angell</u> above and IPI had no reason to doubt their accuracy.  The case *sub judice* is not an "exceptional case" where "the facts are so clear as to permit only one conclusion" so as to justify a holding as a matter of law that IPI could not have reasonably relied on the misrepresentations in the MCSA.

F.  <u>The ELR Does Not Bar the UDTPA Claims.</u>

Count III is based on Defendants' misrepresentations as constituting deceptive acts under the UDTPA.  A UDTPA case with facts analogous to the present case is <u>Marshall</u>, where the defendant leased mobile home spaces to the plaintiffs and promised in the lease obligated construct certain new facilities.  There was no claim for fraud.  The court found a violation of UDTPA after the jury answered yes to the following question:

Did the defendant, after October 7, 1974, without the intent and/or the ability to perform lead the plaintiffs or any of them to believe that he would provide the following equipped facilities for their use, reasonable wear and tear accepted (sic)?

<u>Marshall</u>, 302 N.C. at 541, 276 S.E.2d at 399 (1981). This same question could be recast in the present case to support the UDTPA claim:

Did the defendants, at the time of the execution of the MCSA, without the intent and/or the ability for Hoku Materials to meet its payment obligations, participate in leading the plaintiff [IPI] to

17

> believe that Hoku Materials would meet its payment obligations
> under the MCSA?

In the new Count IV, IPI claims that Zhang and Liu's decision to allow IPI to continue working and to issue the MCSA when Hoku Materials was grossly undercapitalized and Tianwei was not committed to providing the needed $300 million, constituted unfair acts under the UDTPA. Because Count IV is not based on misrepresentation, it is not necessary to show reliance.

The ELR should not apply to the UDTPA claims for several reasons. IPI alleges that Paul's participated in the misrepresentations with reckless indifference as to their truthfulness. (FAC ¶¶ 14, 18, 350-351). IPI also alleges in Count IV that the Defendants committed the unfair acts with a reckless indifference and conscious disregard to the harm that they would be caused to IPI. Reckless indifference is an aggravating circumstance that takes the UDTPA claim out of the ambit of the economic loss rule. Additionally, the ELR does not apply where there is an aggravating circumstance such as reckless indifference. See Judge Conrad's decision in Johnson Products Co., 966 F. Supp. 2d at 981-82; Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc., No. 109CV00018, 2010 WL 3943754, at *2 (M.D.N.C. Oct. 7, 2010). Additionally, there is plenty of reason to find that the ELR should not apply to a UDTPA claim under any circumstance, even where there is no "aggravating circumstance." In Marshall, 302 N.C. at 546-47, 276 S.E.2d at 402, the court allowed plaintiffs to go to the jury with both a breach of lease claim and a UDTPA claim because "common law remedies had proved often ineffective" and the UDTPA provides "a remedy for an entirely statutory cause of action." Id. Additionally, subsequent decisions have allowed both a breach of contract remedy and a UDTPA claim. Bernard v. Cent. Carolina Truck Sales, Inc., 68 N.C. App. 228, 230, 314 S.E.2d 582, 584 (1984); United Labs., Inc. v. Kuykendall, 335 N.C. 183, 184, 437 S.E.2d 374, 375 (1993).

Two federal district courts have considered the issue at some length and both concluded that the ELR does not bar a UDTPA claim under North Carolina law. In re MyFord Touch Consumer Litig., No. C-13-3072 EMC, 2014 WL 2451291, at *1 (N.D. Cal. 2014)(UDTPA "gives rise to a duty independent of the contract and therefore should not be barred by the economic loss rule."); In re Saturn L-Series Timing Chain Products Lab. Litig., 2008 WL 4866604, at *18 (D. Neb. 2008)( even in class action product defect case against automobile manufacturers, "this Court will not apply a common law doctrine [ELR] to terminate a cause of action specifically created by North Carolina's legislature unless clearly directed to do so by North Carolina's courts.").

Zhang and Liu cite Broussard, which is distinguishable in that the dispute centered on "the administration of a common advertising trust fund for the benefit of all Meineke dealers" and "the parties differ fundamentally on their rights and obligations under the Franchise and Trademark Agreements that govern every aspect of their relationship." Broussard, 155 F.3d at 345. In the present case, the claims center on misrepresentations concerning Hoku Materials' financial status and the unfair acts of allowing IPI to continue working and issuing the MCSA when Hoku Materials was grossly undercapitalized.

G.  IPI Has Sufficiently Pled Fraud.

IPI responds here to Zhang and Liu's contention at page 19 of their Memorandum that IPI has not sufficiently pled fraud. As discussed earlier, Zhang and Liu are personally liable for negligent misrepresentation because of their participation in the misrepresentations under Section 531 of the Restatement. The same conclusion applies with regard to fraud. IPI's fraud claim is based first on the "express and continuing" representations in the MCSA that Paul reviewed and approved, stating positively: "Owner [Hoku Materials] is financially solvent, able to pay its debts

as they mature and has sufficient working capital to complete its obligations under this Agreement."

The required scienter for fraud is not present without both knowledge of falsity (or reckless disregard for the truth of the representation) and an intent to deceive, manipulate, or defraud. Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 568-69, 374 S.E.2d 385, 391 (1988). IPI would also point out that Rule 9(b) states that "intent, knowledge, and other conditions of a person's mind may be alleged generally" as required by Rule 8. See Wright v. Bankamerica Corp., 219 F.3d 79 (2nd Cir. 2000)(fraud must be pled with particularity, but intent of the perpetrator need not be alleged with specificity).

## VENUE IN NORTH CAROLINA IS PROPER

A. Forum Selection/Choice of Law Clauses.

Zhang and Liu contend that are "numerous forum selection clauses" in the Tank Farm Contract and MCSA. P. 3 and 21. Defendants mischaracterize the so-called forum selection clause. There is a very limited provision in Section 15.4 that provides that, in an arbitration between IPI and Hoku Materials, "if either party may be prejudiced as set forth above by the inability of party to join [to the arbitration] another party that would be subject to the jurisdiction of the state or federal courts of the State of Idaho, such party may (but is not obligated to) move the arbitrator(s) [to] dismiss the arbitration and direct the parties to litigate such matters in any court of competent jurisdiction located in Idaho and each party hereby irrevocably and unconditionally submits to such exclusive jurisdiction and venue." This is what Zhang and Liu misleadingly refer to as "numerous forum selection clauses." By selectively quoting just a few of these words at p. 3 of their Memorandum, Zhang and Liu mischaracterize this provision. The

quoted provision obviously has no application here since there is no arbitration and no inability to add to an arbitration a party subject to the jurisdiction of the courts in Idaho.

Moreover, the Fourth Circuit has explained that *ex delicto* claims, like a UDTPA claim or misrepresentation, apply "without regard to the presence of the contractual choice of law provision. The nature of the liability allegedly to be imposed by the statute is ex delicto, not ex contractu. No issue of contractual construction, interpretation, or enforceability is raised by this case. The liability alleged is predicated, rather, upon actions separate and distinct from the Dealer Sales Agreement itself."   Thus, forum selection clauses are not binding here, particularly since Defendants are not parties to the contract  ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 49 n. 11 (4th Cir. 1983).

B. Transfer of Venue if Venue or Personal Jurisdiction is Improper in North Carolina.

Section 1406(b) require a showing that Idaho is a district where the action might have been brought.   To meet that requirement, "the transferee court must be a proper venue and must have personal jurisdiction over the defendant. Indeed, these two characteristics must be independently true, without considering waiver of either venue or personal jurisdiction by the defendant." Forums to which Transfer Possible, 15 Fed. Prac. & Proc. Juris. § 3845 (4th ed.)(Citing Hoffman v. Blaski, 363 U.S. 335, 80 S. Ct. 1084, 4 L. Ed. 2d 1254 (1960)).  Defendants have previously argued in the fraud/RICO case brought by another contractor (JH Kelly) in Idaho in 2013 that Idaho did not have personal jurisdiction.  Though the JH Kelly case has similarities to the present case, the allegations and claims in the present case are materially different.   Nevertheless, the argument Zhang and Liu made in their Motion to Dismiss in that case is relevant to the present case.  A copy of their "Memorandum in Support of Motion to Dismiss or Stay" filed in that case is attached as Exhibit B to the Affidavit of Daniel Weber.

In this memorandum, they argued that Idaho did not have personal jurisdiction because §5-514(b) of the long arm statute, which confers jurisdiction where the claim is based on "the commission of a tortious act within this state," did not apply. They cited several cases as holding that the injury must have occurred in Idaho to invoke §5-514(b). They also cited cases holding that the injury to JH Kelly occurred, for jurisdictional purposes, in Washington since that is location of JH Kelly's principal place of business. Saint Alphonsus Reg'l Med. Ctr. v. Washington, 852 P.2d 491, 495 (Idaho 1993) ("[A]n allegation that an injury has occurred in Idaho in a tortious manner is sufficient to invoke…§ 5–514(b)."); CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1079 (9th Cir. 2011) ("corporation incurs economic loss, for jurisdictional purposes, in the forum of its principal place."). These authorities not only support finding in the present case that North Carolina has personal jurisdiction and Idaho does not under its own long arm statute.

Defendants argue alternatively that, even if venue is proper in North Carolina, the case should be transferred under Section 1404(a) for the convenience of the parties and the witnesses. Idaho would not be more convenient for a number of reasons. First, none of the parties is in Idaho. Paul, Liu, and Zhang live in Hawaii, California, and New Jersey, respectively. IPI is in North Carolina and its management team (Jones, Ransom, Brakefield, and Roberts) reside in North Carolina or next door South Carolina (IPI's office is a few miles from the state line). As for witnesses, there simply are very few, if any, in Idaho that would have any knowledge relevant to this case. Defendants have not pointed to a single witness in Idaho. All of the Hoku officers and managers came to Idaho from outside, and, to the best of IPI's knowledge have dispersed back to where they came. (See Decl. of Mike Jones, submitted for jurisdiction/venue purposes *only*).

Defendants try to make it sound like there is much activity in the bankruptcy case in Idaho. Defendants are not parties to the bankruptcy because they did not provide proofs of claim.

Currently, the only activity is in the state court where the court is assigned the limited task of determining the priority to the $7 million in net proceeds available to satisfy numerous secured creditors. In this regard the court may want to examine the Federal Bankruptcy order lifting the stay and sending the case to the state court for the limited purpose of determining priority. Also, IPI submits the most recent order from the state court directing the parties to mediation to resolve how the $7 million in net proceeds should be divvied up. Finally, IPI's choice of North Carolina as the forum should be given great weight.

Respectfully submitted this the 23rd day of February, 2015,

/s/ Elizabeth A. Martineau
Elizabeth A. Martineau
NC Bar # 26394
Martineau King PLLC
PO Box 31188
Charlotte, NC  28231
704-247-8520 – Ph
704-943-0543 – Fax
emartineau@martineauking.com
*Attorney for the Plaintiff*


/s/ Daniel J. Weber
Daniel J. Weber
Georgia Bar No. 744869
DelCampo Weber & Grayson LLC
5455 Chamblee Dunwoody
Atlanta, Georgia 30338
Telephone: (404) 808-6670
Email: Dan@dwglawfirm.com
*Attorney for the Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO ZHANG AND LIU'S MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION TO TRANSFER VENUE** was served upon all counsel of record by depositing a copy of the same in an official depository of the United States mail in a postage-paid envelope, or pursuant to the ECF service if appropriate, addressed as follows:

Jack S. Gjording
James B. Smith
Gjording Fouser PLLC
121 N. 9th Street
P.O. Box 2837
Boise, ID 83702
jgjording@gfidaholaw.com
jsmith@gfidaholaw.com
*Attorneys for Tao Zhang and Dayi Liu*

Howard Holderness
Morgan Lewis & Bockius, LLP
One Market, Spear Street Tower
San Francisco, Ca 94105
hholderness@morganlewis.com

Celeste K. Miller
McDevitt & Miller LLP
420 West Bannock St.
P.O. Box 2564
Boise, Idaho 83701
ck@mcdevitt-miller.com

John William Ormand, III
Brooks, Pierce, McLendon, Humphrey &
Leonard, LLP
P.O. Box 1800
Raleigh, NC 27602
jormand@brookpierce.com

*Attorneys for Scott Paul*

This the 23rd day of February, 2015.

/s/ Elizabeth A. Martineau
Elizabeth A. Martineau
NC Bar # 26394
Martineau King PLLC
PO Box 31188
Charlotte, NC 28231
Telephone: (704) 247-8520
Fax: (704) 943-0543
Email: emartineau@martineauking.com
*Attorney for the Plaintiff*